Claude Y. PAQUIN et al.,
Plaintiffs-Appellants,

v.

FOUR SEASONS OF TENNESSEE,
INC., et al., Defendants,

Norman H. Cronk, Defendant-Appellee.

No. 74–2890.

United States Court of Appeals,
Fifth Circuit.

Sept. 17, 1975.

Rehearing and Rehearing En Banc
Denied Nov. 7, 1975.
See 522 F.2d 1270.

Claude Y. Paquin, pro se.

Norman H. Cronk, pro se.

Long & Siefferman, Floyd E. Siefferman, Jr., Atlanta, Ga., for defendant-appellee.

Before COLEMAN, MORGAN and CLARK, Circuit Judges.

COLEMAN, Circuit Judge.

This is a case in which five gallons of "free" gasoline unexpectedly cost 8,000 dollars. The couple who bought the lot at the end of the Sunday ride in the gasoline buggy sustained a painful loss. They sued to retrieve their money. The District Court denied recovery against an *employee* of the developer. Despite our keen disapproval of what happened to the appellants, we are convinced on both the facts and the law that the result was legally correct. The judgment will accordingly be affirmed.

We narrate the calamitous events in chronological order.

## I

### Facts of the Case

#### (a) Four Seasons

In the Spring of 1970, Diversified Land Developers, Inc., a Tennessee Corporation, domiciled at 1314 Parkway Towers, Nashville, had a wholly owned subsidiary known as Four Seasons of Tennessee. Near Newnan, Georgia, Four Seasons of Tennessee had under construction a "second home" recreational development known as "Four Seasons of Georgia". As if the multiplicity of seasons was not enough, Diversified Land Developers was a wholly owned subsidiary of Whale, Inc., also a Tennessee Corporation, domiciled at 4101 Charlotte Avenue, Nashville.

Whale, Inc. owned, among other things, franchises for Minnie Pearl's Chicken Stores and Minnie Pearl's Roast Beef Stores. On May 20, 1970, in the United States District Court for the Middle District of Tennessee, Whale petitioned for Chapter X bankruptcy relief. Ultimately, on March 1, 1972, Whale was adjudged to be "hopelessly insolvent with no business to operate".

In the meantime, on July 24, 1970, the President of Diversified Land Developers, Inc. purchased for cash all of the outstanding capital stock of Diversified from Whale's bankruptcy trustee. Diversified was returned to its status as a totally independent, privately owned company. As already stated Diversified owned Four Seasons of Tennessee and that corporation operated the Newnan project. Four Seasons of Georgia, however, was not formally incorporated until December 17, 1970. In any event, Whale was two corporations removed from the Newnan development. There is no evidence in the record that Whale ever had anything to do with planning, promoting, or financing the development or that anybody directly connected with the Newnan development ever held out any purported connection with Whale.

#### (b) Enter the Paquins (buyers) and Cronk (defendant)

The developers advertised in the Atlanta papers that they would give five gallons of gasoline free to anyone who would visit the Newnan project. On Sunday, July 12, 1970, Mr. and Mrs. Claude Paquin took advantage of this offer.

The development was in its early stages, but the master plan for the community called for many recreational amenities, such as a golf course, several lakes for boating and fishing, bridle paths, and a clubhouse for all residents of the development. Although it was a Sunday afternoon, there was much activity about the place and lots appeared to be selling rapidly.

First, the Paquins, along with others, heard a sales talk by George Day, Sales Manager for Four Seasons of Tennessee. The Pacquins were then assigned for a tour of the development with Norman A. Cronk, a retired Lieutenant Colonel and part-time employee for Four Seasons, who was destined to become a defendant in the lawsuit. On the tour the Pacquins became interested in a lot located on a small fishing lake and entered into negotiations to purchase it. Cronk got in touch with the sales manager, who named the final price figure for the lot. Cronk then escorted them to the sales

office. There the Paquins were presented with a project property report, as required by 15 U.S.C. §§ 1703, 1707. Mr. Paquin carefully read the property report and a pamphlet detailing restrictive covenants applicable to the project.

At the Bench trial before Judge Henderson, Mr. Paquin testified as follows:

"When he [Cronk] came back we asked him various questions about the property report. We brought up the fact there were statements in the property report that everything was dependent upon the developer obtaining adequate financing and this sort of thing, so I asked him, 'How are sales going? Are you selling lots the way that things are expected to be sold so you can meet your commitments?' And he said, 'Oh, yes. Sales are real good. And you can see from all the activity today,' or words to that effect."

The PROPERTY REPORT stated:

"No assurances of completion can be given for any of the above services to be expressly provided by the developer at Four Seasons of Georgia other than the good faith and past reputation of the developer. Completion of these, as in other areas of development, will be dependent upon the satisfactory sale of lots at Four Seasons of Georgia and the developer's ability to secure adequate financing."

With reference to the completion of the proposed lodge, lake, golf course, recreational areas, dry-dock storage and marina, and riding academy, it was expressly stated as to each *individually* that

"Completion is dependent upon the satisfactory sale of lots at Four Seasons of Georgia and the developer's ability to secure adequate financing."

Thus, at seven points in the property report the warning flag was hoisted: the fate of the project depended upon the satisfactory sale of lots and the ability of the developer to obtain adequate financing. Mr. Paquin noticed these express provisions, and questioned Mr. Cronk

about it before he and his wife executed the sales contract.

The evidence shows that inability to sell the required number of lots was a prime cause of the project failure.

After Mr. Paquin had read the property report and the restrictive covenant pamphlet and had announced his decision to purchase the lot, he was presented a sales contract, which he and his wife signed before a secretary in the sales office. This sales contract was dated at 5:40 p. m., Sunday, July 12, 1970. The seller in the contract was named as Four Seasons of Tennessee. Norman Cronk's name was typed in as the "authorized representative" and the evidence is clear that Cronk did not know his name was typed in on the sales contract. For his part in the sale of the property Cronk received a commission of 9% of the sale price.

By August 24, 1970, the Paquins had paid the purchase price in full. However, they did not demand delivery of a deed of conveyance contemporaneously with delivery of the final payment. It was not until November that the deed was recorded in the office of the Coweta County Clerk and delivered to Mr. Paquin. This delay, however, is of no material significance for it in no wise adversely affected title in the Paquins.

II

*The Interstate Land Sales Full Disclosure Act of 1968, as amended*

What happened to the Paquins was occurring with enough frequency by 1968 that the Congress of the United States became concerned.

On August 1, 1968, the President signed Senate Bill 3497 (Public Law 90–448, 82 Stat. 476). This was a comprehensive housing statute, containing seventeen titles and 136 printed pages. Title XIV—Interstate Land Sales, effective 270 days after the date of its enactment, is to be cited as the "Interstate Land Sales Full Disclosure Act" and is codified at 15 U.S.C. § 1701 et seq.

Congress amended the original Act in 1969 and again in 1974, Public Law 91–152 (1969) and Public Law 93–383 (1974).

■ The Act closely parallels the philosophy and approach of the Securities Act of 1933. The underlying purpose of both is that prior to the purchase the buyer must be informed of facts which would enable a reasonably prudent individual to make an informed decision about purchasing the security or the property. The test of materiality is whether a reasonable investor might have considered the omitted fact or erroneous statement as important in making a decision. *See Affiliated Ute Citizens of Utah v. United States,* 1972, 406 U.S. 128, 153–54, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741.

In this appeal we are particularly concerned with pertinent portions of two sections of the Act, §§ 1404 and 1410 [15 U.S.C. §§ 1703 and 1709]:

*Prohibitions Relating To The Sale Or Lease Of Lots In Subdivisions*

Sec. 1404. (a) It shall be unlawful for any developer or agent, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce, or of the mails—

(1) to sell or lease any lot in any subdivision unless a statement of record with respect to such lot is in effect in accordance with section 1407 and a printed property report, meeting the requirements of section 1408, is furnished to the purchaser in advance of the signing of any contract or agreement for sale or lease by the purchaser; and

(2) in selling or leasing, or offering to sell or lease, any lot in a subdivision—

(A) to employ any device, scheme, or artifice to defraud, or

(B) to obtain money or property by means of a material misrepresentation with respect to any information included in the statement of record or the property report or with respect to any other information pertinent to the lot or the subdivision and upon which the purchaser relies, or

(C) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a purchaser.

*Civil Liabilities*

Sec. 1410. (a) Where any part of the statement of record, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein, any person acquiring a lot in the subdivision covered by such statement of record from the developer or his agent during such period the statement remained uncorrected (unless it is proved that at the time of such acquisition he knew of such untruth or omission) may, either at law or in equity, in any court of competent jurisdiction, sue the developer.

(b) Any developer or agent, who sells or leases a lot in a subdivision—

(1) in violation of section 1404, or

(2) by means of a property report which contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein, may be sued by the purchaser of such lot.

(c) The suit authorized under subsection (a) or (b) may be to recover such damages as shall represent the difference between the amount paid for the lot and the reasonable cost of any improvements thereto, and the lesser of (1) the value thereof as of the time such suit was brought, or (2) the price at which such lot shall have been disposed of in a bona fide market transaction before suit, or (3) the price at which such lot shall have been disposed of after suit in a bona fide market transaction but before judgment.

## III

### *The Lawsuit*

On August 6, 1971, Pacquin and wife filed suit against Four Seasons of Tennessee and Norman H. Cronk for $8,010.30, the purchase price of the land and the cost of recording the warranty deed, plus interest and costs.

The gist of the Complaint appears in its paragraphs numbered 10, 11, and 13, which alleged that the plaintiffs were given a property report to read, that in reliance upon its representations, the oral representations of Cronk, "as well as a proposed timetable for the development of all its facilities, plaintiffs did succumb to the lures so enticingly urged upon them and bought from defendant Four Seasons of Tenn., through its agent Norman H. Cronk, one of the lots offered for sale".

The concluding paragraph, Number 13, read as follows:

"Unbeknownst to plaintiffs, but known to defendant Four Seasons of Tenn. and to the developer whose name was stated in the Property Report, namely Diversified Land Developers, Inc., the latter was the wholly-owned subsidiary of Whale, Inc., a corporation, and Whale, Inc., was, on July 12, 1970, in the throes of bankruptcy. Diversified Land Developers, Inc.,'s timetable for the development of Four Seasons of Georgia was heavily dependent upon financing to be provided by its then parent corporation, Whale, Inc., but by July 12, 1970 Diversified Land Developers, Inc., and defendant Four Seasons of Tenn., knew or should have known that (a) Whale, Inc., could not provide the needed financing and (b) the timetable for the completion of their projects shown or explained to plaintiffs and relied upon by plaintiffs was totally unrealistic, not founded in reason, misleading, and contrary to the requirements of the Interstate Land Sales Full Disclosure Act and the rules and regulations thereunder."

■ After a two day Bench trial, Judge Henderson found that the sale was not exempted by 15 U.S.C. § 1702(a)(10) and we agree. He found that *for the purposes of offering the lot for sale*, Cronk was an agent of the developer within the meaning of § 1701 of the Act, which was conceded in oral argument before this Court. He further held that there was no evidence that Cronk had knowingly and wilfully misrepresented material facts in the sale of the lot. After a critical examination of the trial record, with this we also agree.

The trial court then concluded as follows:

"Liability under 15 U.S.C. § 1703(a)(1) is dependent on a statement of record in effect pursuant to 'section 1706 of this title' and a 'property report meeting the requirements of section 1707 of this title, being furnished to the purchaser in advance . . . .' of the sale. The statement of record filed with the Secretary of the Department of Urban Development (Defendant's Exhibit No. 3), complies with 15 U.S.C. § 1706 (24 C.F.R. § 1710.105). Similarly, the property report (Plaintiffs' Exhibit No. 7) fulfills the requirements of 15 U.S.C. § 1707 (24 C.F.R. § 1710.110). No evidence was adduced at the trial to establish the contrary. Neither is there any showing of a material misrepresentation or omission of material facts in the property report. Accordingly, the plaintiffs have not sustained the burden of proof in establishing their right of recovery."

We think this is factually supported by substantial evidence in the record and is legally correct.

We have carefully considered each and all of the attacks on the statement of record and on the property report. We are compelled to say that they fail either for lack of factual substance or for lack of materiality.

■ We need only discuss the allegation that once Whale, Inc., filed in bankruptcy Four Seasons of Tennessee had the duty, under the Act, to divulge that fact in its property report. We have already pointed out that Four Seasons of

Tennessee was a corporation in its own right, a separate entity, a legal being with an existence separate and distinct from that of its stockholders, *Krivo Industrial Supply Company v. National Distillers and Chemical Corporation*, 5 Cir., 1973, 483 F.2d 1098, 490 F.2d 916. As already pointed out, there is no evidence whatever that Four Seasons of Tennessee held itself out as relying on Whale's financial assistance or that Whale had anything to do with the development other than it owned the stock of the corporation which owned the stock of Four Seasons of Tennessee.

On the other hand, the property report repeatedly warned that success depended on satisfactory sale of the lots and the ability of Four Seasons of Tennessee to secure adequate financing.

We are therefore of the opinion that the District Court could justifiably hold, as it did, that the failure to mention Whale, and its status, was immaterial.

As a matter of fact, some weeks after the Paquin transaction the President of Diversified bought all of Diversified's stock from Whale's trustee and paid cash for it.

## IV

### *An Additional Point*

The record reflects that the litigants did not direct the critical attention of the trial Court toward § 1410 of the Act. If they had done so the Court might have quickly decided the case on that point alone. Under the facts of this case § 1410, quoted *supra*, does not authorize the suit against Cronk. A careful reading of that section shows that under § 1410(a) *the developer* may be sued for its wrongful acts AND for those of its agent. But § 1410(b) plainly states that an agent may be sued only if he "*sells* (emphasis added) or leases a lot in a subdivision". Under the record before us, Cronk had no authority to sell. He did not hold himself out to the Paquins as having that authority. To the contrary, in their presence, Cronk had to confer with Tennessee's sales manager on the premises to obtain the price at which Tennessee would sell. Cronk could show the property and conduct the prospective purchasers around the premises but when the Paquins made the decision to buy they were turned over to another employee who made out the contract, reciting that Tennessee was the seller. Cronk had no part in this transaction, although, unbeknownst to him, his name was typewritten on the document as "the authorized representative", whatever that meant. Tennessee, of course, executed the deed of conveyance and had it delivered.

We think the language of § 1410 clearly indicates that Congress intended the developer to be liable for its own acts and those of its agents, which is the usual rule, but it did not mean to scoop up every guide or salesman, such as this retired army officer, and make them pay unless they, too, have the authority to sell and do sell.

There was a default judgment here against the developer, which the record indicates is worthless, but, even so, the Court found that Cronk made no misrepresentations. He had no authority to sell the lot, he did not sell it, and Congress did not so write the statute as to make Cronk liable for the misdeeds of others, had there been any within the terms of the Act.

## V

Appellants complain that the trial court allowed interest on the default judgment only from its date. This action, however, was correct. The extent of recovery is clearly spelled out in § 1410.

The judgment of the District Court is

Affirmed.

CLARK, Circuit Judge (dissenting).

In my view the failure of the Property Report to state that the senior parent in the developer's corporate ancestry was bankrupt was a clear violation of the Interstate Land Sales Full Disclosure Act. That Act requires that disclosure

be made of all material facts. According to the test recognized by the majority, a fact is material if a reasonable investor may have considered it important in making a decision. The significance of the present omission to one in Paquin's position can best be demonstrated by reviewing the Property Report with the pass over supplied in italics. The paragraph in question would then read:

> No assurances of completion can be given for any of the above services to be expressly provided by the developer at Four Seasons of Georgia other than the good faith and past reputation of the developer. Completion of these, as in other areas of development, will be dependent upon the satisfactory sale of lots at Four Seasons of Georgia and the developer's ability to secure adequate financing. *The corporation which owns all of the stock of the corporation which owns all of the stock of the developer is now in bankruptcy.*

This omission should have appeared a total of seven times throughout the Report. The vital import of the left out fact to potential purchasers is self-evident.

The "Additional Point" which appears in the majority opinion finds that Cronk did not "sell" the lot to Paquin within the meaning of § 1410(b). The district court, on the other hand, found that Cronk was an agent under § 1402(5) and that he made offers to sell and was present at the sale. However, because it found the property report sufficient and no misrepresentations by Cronk, that court never reached the need to find whether Cronk's intimate involvement in Paquin's purchase transaction made him one who "sells" within the meaning of § 1410(b). If Cronk was a seller the deficient Property Report renders him liable under the act. I would remand the "seller" issue to the district court rather than making that fact determination in this appellate forum.

I respectfully dissent.