Charles P. ANDERS, et al., Plaintiffs,

Kim Berg, Appellant,

v.

DAKOTA LAND AND DEVELOPMENT CO., INC., et al., Defendants,

Kenneth Elliott, Respondent.

No. C5–85–904.

Court of Appeals of Minnesota.

Feb. 4, 1986.

Frank T. Mabley, Greenstein, Mabley & Wall, Roseville, for appellant.

Richard A. Grayson, Sanborn & Grayson, St. Paul, for respondent.

Heard, considered and decided by FOLEY, P.J., and SEDGWICK and LANSING, JJ.

## OPINION

FOLEY, Judge.

Kim Berg, one of numerous contract for deed vendees in this action, appeals from a judgment dismissing various statutory claims against Kenneth Elliott, the real estate agent who participated in the sale of real property to Berg. Specifically, Berg pleads claims under the Interstate Land Sales Full Disclosure Act, 15 U.S.C. § 1701 et seq.; the Securities Act of 1933, 15 U.S.C. § 77 et seq.; the Minnesota Securities Act, Minn.Stat. §§ 80A.01–.31; and Minn.Stat. § 462.358, subd. 4(a). We affirm.

## FACTS

When purchasers of undeveloped real estate realized the promised development was not taking place, they sued the developer/owner, the real estate brokerage firm, certain employees and officers of the above entities, and the contract for deed assignees of the developer/owner, asserting violations of federal and state securities and land sale statutes. The underlying facts of the development scheme are set out in Anders v. Dakota Land & Development Co., Inc., 289 N.W.2d 161 (Minn.1980).[1]

In early 1974, respondent Kenneth Elliott responded to the advertisement of Diversified Listings, Inc. for licensed pilots. Diversified, a real estate brokerage firm, sought to employ pilots to fly prospective purchasers over certain agricultural land in Dakota County and to describe its attractiveness as a development. This land was being developed by Dakota Land and Development Co., Inc.

Before commencing work, Elliott obtained a Minnesota real estate license. Diversified then gave him a list of prospective purchasers to contact. Elliott contacted and met with appellant Kim Berg and his wife. The Bergs expressed interest in the development and agreed to fly over the property with Elliott on March 24, 1974.

During the flight, the Bergs observed that the land in the development was bare land that had been cleared and graded. Elliott informed them that water and sewer lines had not been installed and that no building permits could be issued prior to the installation of those utilities. Elliott also described the attractiveness of the development as an investment—the Minnesota Zoo was in the general area; Burnsville Center shopping mall was about to open nearby; and Dakota County Vo-Tech was just south of the development.

Based on the Bergs' interest, Elliott took them to Diversified's offices to meet president Craig Soderholm. During this meeting, the Bergs signed a purchase agreement to buy two parcels of property in the development. In addition, they signed two contracts for deed—one for each parcel. Elliott signed the purchase agreement as "Agent." Robert Laddusaw, president of Dakota Land, signed the purchase agreements and contracts for deed as the "seller" on behalf of Dakota Land.

The next day Elliott picked up the Bergs' down payment at their home. He was to receive a 10% commission on the sale. Elliott worked for Diversified approximately two months, flying four parties over the development. The Bergs were the only party to buy any parcels. Diversified paid Elliott $390 compensation.

The Bergs' contracts for deed were assigned by Dakota Land to two other parties. When the Bergs stopped paying on the contracts, the assignees each obtained a judgment of approximately $4,000 against the Bergs. Neither judgment has been satisfied.

The trial court found that Elliott showed Berg the parcels and that Berg subsequently purchased the parcels through Elliott's employer, Diversified. The court also found that Elliott was not a seller or agent within the contemplation of either the Interstate Land Sales Full Disclosure

---

1. Neither party cited the court to this opinion. It would be helpful to the court of appeals if parties would cite any prior supreme court opinions delivered in the course of the litigation.

Act or the Securities Act of 1933. Finally, the court found that Elliott was not a seller or agent so as to impose liability under either the Minnesota Securities Act or the Minnesota Subdivided Land Sales Act. The court accordingly dismissed Berg's complaint. Berg did not make a motion for a new trial.

## ISSUES

1. Was respondent an "agent" who "sold" real estate under the Interstate Land Sales Full Disclosure Act?

2. Was respondent a "seller" or "conveyor" under Minn.Stat. § 462.358, subd. 4(a)?

3. Did respondent "offer to sell" or "sell" a security under the Securities Act of 1933 or under the Minnesota Securities Act?

## ANALYSIS

■ The sole issue before the court on appeal from a judgment where there has been no motion for a new trial is whether the evidence sustains the findings of fact and whether such findings sustain the conclusions of law and the judgment. *Tonka Tours, Inc. v. Chadima,* 372 N.W.2d 723, 728 (Minn.1985). However, findings of fact made by a trial court will only be set aside if clearly erroneous, regardless of whether or not a motion for a new trial has been made. *Tonka Tours,* 372 N.W.2d at 726. Appellant claims the trial court's findings that respondent was not a "seller" under any of the above-enumerated statutes are clearly erroneous.

### I.

■ The Interstate Land Sales Full Disclosure Act (ILSFDA) was passed in 1968 to "prevent false and deceptive practices in the sale of unimproved tracts of land by requiring developers to disclose information needed by potential buyers." *Flint Ridge Development Co. v. Scenic Rivers Association of Oklahoma,* 426 U.S. 776, 778, 96 S.Ct. 2430, 2433, 49 L.Ed.2d 205 (1976). The Act requires information be disclosed by the filing of a "statement of record" and by the furnishing of a "property report" to a potential buyer prior to the sale of a lot. 15 U.S.C. §§ 1704, 1705, 1703(a)(1)(B), 1707 (1982).

Section 1709(b) (1974) (amended 1979) provided:

> Any developer or agent, who sells or leases a lot in a subdivision
>
> (1) in violation of section 1703, or
>
> (2) by means of a property report which contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein, may be sued by the purchaser of such lot.[2]

Section 1701(6) (1982) defines "agent" as:

> [A]ny person who represents, or acts for or on behalf of, a developer in selling * * or offering to sell * * * any lot or lots in a subdivision; * * *.

The trial court found that Elliott was not an "agent" under the Act, but contrary to its finding, stated in its memorandum that "Elliott * * * did act as agent for Dakota Land and Development in the offering to sell its offending lots." We think it plain that Elliott was an "agent" under the Act.

However, as the trial court correctly noted, section 1709(6) only authorizes suit against an agent who *sells* a lot in a subdivision. While the term "seller" is not defined by the Act, it has been held that agents must have the authority to sell in order to be liable under the Act. *Paquin v. Four Seasons of Tennessee, Inc.,* 519 F.2d 1105 (5th Cir.1975), *cert. denied, 425*

---

2. We can find absolutely no evidence in the record of any actual violations of the Interstate Land Sales Full Disclosure Act. The trial court did not make any findings the Act was ever violated. At oral argument, counsel did not indicate that they had stipulated to any violation of the Act. However, in a memorandum to the trial court, respondent stated that it was "impos-

sible to argue the Act was not violated by the developer: no statement of record or property report was ever prepared, filed or given to potential lot purchasers." Thus, upon this admission, we have addressed the merits of appellants' claim under the Interstate Land Sales Full Disclosure Act.

U.S. 972, 96 S.Ct. 2168, 48 L.Ed.2d 795 (1976).

In *Paquin,* the agent of the developer conducted the purchasers around the development but did not have the authority to quote a sale price. When the purchasers made the decision to buy, they were "turned over to another employee who made out the contract, reciting that [the developer] was the seller." *Id.* at 1111. The purchasers sued the agent for violation of the Act, and the Fifth Circuit, affirming a decision in favor of the agent, noted:

> We think the language of § 1410 [codified as 15 U.S.C. § 1709] clearly indicates that Congress intended the developer to be liable for its own acts and those of its agents, which is the usual rule, but it did not mean to scoop up every guide or salesman, such as this retired army officer, and make them pay unless they, too, have the authority to sell and do sell.

*Id.* at 1111.

Berg argues that Elliott's involvement in the sale was more extensive than that of the agent in *Paquin.* Unlike the agent in *Paquin,* Elliott was a licensed real estate agent, he initially solicited Berg, and he personally signed his name to the purchase agreement.

Despite these differences, we cannot say that the trial court's finding that Elliott did not "sell" a lot under the Act is clearly erroneous. Elliott was not listed as the "seller" on the purchase agreement. The testimony indicates that Elliott and Berg had not spoken about any particular lots during the flight and that Berg did not begin to focus on any particular lots until he met with Soderholm. Taking into account that Congress intended the "protection of the Act * * * be leveled against the fraudulent planners and profit makers" of a development, *McCown v. Heidler,* 527 F.2d 204, 207 (10th Cir.1975), we conclude the trial court looked to the correct factors in determining that Elliott did not sell a lot, and its finding is not clearly erroneous.

## II.

The trial court ruled that Elliott was not a "seller" of land under Minn.Stat. § 462.-358, subd. 4(a), and hence was not liable in an action brought by a purchaser pursuant to that section. Section 462.358, subd. 4(a) only became effective in 1980, some six years after the sale in issue here. There is no indication the statute was to be given retroactive effect. However, this argument was not made on appeal, and therefore we will address whether section 462.-358, subd. 4(a) (1980) was violated here. That section provides:

> A *person conveying* a new parcel of land which, or the plat for which, has not previously been filed or recorded, and which is part of or would constitute a subdivision to which adopted municipal subdivision regulations apply, *shall attach* to the instrument of conveyance * * *. In any action commenced by a buyer of such a parcel *against the seller* thereof, the misrepresentation of or the failure to disclose material facts in accordance with this subdivision shall be grounds for damages.

(emphasis added).

The trial court ruled that the "seller" is the person conveying the property. Since Elliott did not have the authority to convey the parcels, he could not be a seller under the statute. We agree with the trial court's construction and hold that a seller under section 462.358, subd. 4(a) must be the person *conveying* the parcel of land. Here, the only document in the transaction which Elliott signed was the purchase agreement where he was listed as the agent of the seller, Dakota Land. We need not define the statutory term "conveying" in this appeal, save to say that signing a purchase agreement as an agent of the owner of the property cannot be "conveying a new parcel of land" under the statute.

## III.

Appellant challenges the trial court's ruling that Elliott was not a "seller" under either the Securities Act of 1933, *see* 15 U.S.C. § 77 *et seq.,* or under the Minnesota

Securities Act, Minn.Stat. § 80A.01–.31 (1974). Neither party contests the trial court's ruling that the contracts for deed were "investment contracts" and hence "securities" under both securities acts. *See* 15 U.S.C. § 77b(1); Minn.Stat. § 80A.14, subd. 18.

We are extremely reluctant to engage in an extended analysis of participant liability under the securities acts in this appeal since we can find no evidence in the record of any violation of the securities acts. The trial court did not make any findings of any violations of the above acts. However, in its memorandum accompanying its findings of fact and order for judgment, the trial court stated the lots were "non-exempt securities for which no federal or state registration had been filed * * *." Further, respondent did not argue that there was a failure of proof as to any violation of the securities acts. Accordingly, we will only address Elliott's liability as a "seller" of *unregistered* securities, as no other violations were shown.

Section 12(1) of the Securities Act of 1933, 15 U.S.C. § 77*l* (1982), provides:

Any person who—(1) offers or sells a security in violation of section 77e [section 5] * * * shall be liable to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction * * *.[3]

"Sale" or "sell" is defined as "every contract of sale or disposition of a security or interest in a security, for value." 15 U.S.C. § 77b(3) (1982). "Offer to sell" or "offer" is defined as "every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security, for value." *Id.*

Section 12(1) is a strict liability statute. "To recover, a plaintiff need show only the jurisdictional use of mails or interstate commerce, the lack of the required registration, and the sale of the security by the defendant." *Pharo v. Smith*, 621 F.2d 656,

665 (5th Cir.), *cause remanded, reh'g granted in part* (on pendent state law claims), 625 F.2d 1226 (5th Cir.1980) (footnote omitted).

■ A purchaser of a security may recover pursuant to section 12 only from his immediate seller. *Collins v. Signetics Corp.*, 605 F.2d 110 (3rd Cir.1979). An immediate "seller" under section 12 is one in privity with the purchaser or whose participation in the buy-sell transaction is a "substantial factor" in causing the transaction to take place. *Davis v. Avco Financial Services, Inc.*, 739 F.2d 1057 (6th Cir. 1984); *Junker v. Crory*, 650 F.2d 1349 (5th Cir.1981); *Securities & Exchange Commission v. Murphy*, 626 F.2d 633 (9th Cir. 1980); *Lawler v. Gilliam*, 569 F.2d 1283 (4th Cir.1978). This approach looks to principles of tort law causation in defining the term substantial factor. *Davis*, 739 F.2d at 1066–67.

Unfortunately, the approach taken by the Eighth Circuit is unclear. In *Wasson v. Securities & Exchange Commission*, 558 F.2d 879 (8th Cir.1977), a suspension action against a broker for violations of section 5, the court questioned the "proximate cause" test of the Fifth Circuit. Instead, the court stated that in deciding whether a person sold a security under section 12, a court should examine whether the person "was uniquely positioned to ask relevant questions, acquire material information, or disclose his findings." *Wasson*, 558 F.2d at 886.

However, in *Stokes v. Lokken*, 644 F.2d 779 (8th Cir.1981), an action by a purchaser of unregistered securities, a different panel of the Eighth Circuit, without citing *Wasson*, stated that "the term 'seller,' for purposes of § 12 liability, is not limited to one who actually transfers title," and then seemed to adopt the substantial factor test of *Pharo*. *Stokes*, 644 F.2d at 785. The Minnesota Supreme Court has not ruled on the issue.

---

**3.** 15 U.S.C. § 77e (1982), section 5 of the Securities Act, "requires a stock to be registered with the SEC before sale of that stock can be made to public investors unless the stock is exempt * * or the transaction is exempt * * *." *Pharo v. Smith*, 621 F.2d 656, 665 n. 3 (5th Cir.), *cause remanded, reh'g granted in part* (on pendent state law claims), 625 F.2d 1226 (5th Cir.1980).

There is no indication in *Wasson* that the "uniquely positioned" factor was to apply only in SEC suspension actions against brokers. Indeed, the court's analysis of "sales" in section 12 proceedings relied not upon SEC enforcement decisions but upon cases brought by purchasers of securities against their sellers. *Wasson*, 558 F.2d at 885–87.[4] *Stokes* certainly did not expressly overrule *Wasson*, and by its own admission the *Stokes* panel did "not propose to enter into an involved discussion of the outer limits of seller's liability." *Stokes*, 644 F.2d at 785.

We conclude that in the Eighth Circuit the "substantial factor" test for section 12 liability is followed, but when applying the test, courts should also look to the *Wasson* factor of whether the defendant was uniquely positioned to ask relevant questions, acquire material information or disclose his findings to the purchaser. Consideration of this factor assures that when determining whether a person "sold" a security under section 12, the trier of fact's attention will focus on those policies which the 1933 Act was designed to implement, namely, full disclosure of material information concerning public offering of securities in commerce. *Wasson*, 558 F.2d at 886.

■ We adopt this approach and conclude that the trial court's finding that Elliott was not a seller under section 12(1) was correct. While Elliott did participate in the events leading up to the transaction, it was the meeting with Soderholm which resulted in the sale of the particular lots in question. The evidence does not indicate that Elliott was a substantial factor in what transpired during that meeting.

Further, it is clear that Elliott was not uniquely positioned to ask relevant questions concerning the registration of these securities or to acquire any information about the failure to register. There is no evidence that he participated in the organization of the subdivision. Elliott testified that Soderholm had power to negotiate a lower price per lot if a person bought two lots instead of one. Elliott did not have that power. As an agent for Diversified, hired well after sales in the development began in 1973, Elliott simply was not in a position to inquire into whether sales of this real estate, owned by another company, complied with the statutory provision of the Securities Act of 1933.

■ Minn.Stat. § 80A.08 (1974) also prohibits any person from offering or selling any unregistered security unless the security in the transaction is exempt. Minn.Stat. § 80A.23, subd. 1 (1974) provides:

Any person who sells a security in violation of sections 80A.08 * * * is liable to the person purchasing the security from him * * *.

It does not appear that the term "sells a security" in the Minnesota Securities Act was intended to be more broadly construed than the same term in the 1933 Act. This conclusion is further supported by Minn. Stat. § 80A.31 (1974) which provides:

Sections 80A.01 to 80A.31 shall be so construed as to effectuate its general purpose to make uniform the law of those states which enact it and to coordinate the interpretation of sections 80A.01 to 80A.31 with the related federal regulation.

It would not serve the statutory policy of coordinating the interpretation of Minn. Stat. § 80A.23, subd. 1 with the related federal regulation to hold Elliott a "seller" under the Minnesota Securities Act, but not under the 1933 Act.

### DECISION

Respondent was not a "seller" within the meaning of 15 U.S.C. § 1709(b), 15 U.S.C. § 77*l*(1), Minn.Stat. § 80A.23, subd. 1 or Minn.Stat. § 462.358, subd. 4(a).

Affirmed.

---

**4.** In *Hagert v. Glickman, Lurie, Eiger & Co.*, 520 F.Supp. 1028 (D.C.Minn.1981), *Wasson* was applied to determine if a party was a seller under section 12.