**In re PROFESSIONAL FINANCIAL MANAGEMENT, LTD.**

**Civ. No. 4–85–1600.**

United States District Court,
D. Minnesota,
Fourth Division.

July 8, 1988.

Jeff Ross, and Richard I. Diamond, Estes, Parsinen & Levy, Minneapolis, Minn., and Alonzo B. Seran, Olson, Gunn & Seran, Minneapolis, Minn., for plaintiffs.

Thomas J. Shroyer, and Beth M. Timm, Moss & Barnett, Minneapolis, Minn., for defendants Professional Financial Management, Ltd., J. Kmetz & Associates, Joseph Kmetz, and James Kmetz.

James L. Volling, and Erica Perl, Faegre & Benson, Minneapolis, Minn., for defendant Sheldon P. Barr.

## MEMORANDUM OPINION and ORDER

### DIANA E. MURPHY, District Judge.

### I. BACKGROUND

The general background of this complex litigation is set forth in the court's April 15, 1987 Memorandum Opinion and Order in *Nielsen v. Professional Financial Management, Ltd.*, 682 F.Supp. 429 (D.Minn.1987). Plaintiffs' claims in *Nielsen* relate to the "Energy Brain" leasing and tax shelter plan. Now before the court is plaintiffs' summary judgment motion against defendants Sheldon P. Barr (Barr) and Enersonics, Inc. (Enersonics).[1] Summary judgment is sought on three claims: under the Securities Act of 1933, § 12(2), 15 U.S.C. § 77*l* (Count III); under Minn. Stat. § 80A.08 (1986) (Count VII); and negligence *per se* (Count XV).

---

1. Barr is represented by counsel and has contested plaintiffs' motion. Enersonics has not responded or filed an answer; it has no counsel of record here. For efficiency, however, the issues raised by Barr will be applied to Enersonics where appropriate. Defendants PFM, J. Kmetz and Associates, Joseph Kmetz, and James Kmetz have also submitted materials in opposition to this motion.

On plaintiffs' motion for summary judgment all material facts and inferences are construed in favor of the defendants. *Agristor Leasing v. Farrow*, 826 F.2d 732, 734 (8th Cir.1987). Plaintiffs have the burden of showing that there is "no genuine issue as to any material fact and that [they are] entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The nonmoving parties, however, may not rest merely on the pleadings, but must show that there are specific material facts in dispute creating a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Defendant Barr is a New York attorney and a former partner in the law firm Barr & Bello. In 1981 Barr was involved in the creation of the Energy Brain leasing program.[2] These units were ultimately offered to plaintiffs with the promise of possible profits resulting from the operation of the units and possible tax advantages resulting from energy credits. The central allegation of plaintiffs' amended complaint is that the Energy Brain units were fraudulently overvalued. This led to loss of much of plaintiffs' investment and IRS disallowance of their tax deductions.

Barr was convicted in New York state court on one count of first degree fraud and nine counts of second degree grand larceny for his role in the Energy Brain scheme. *See State of New York v. Sheldon Barr and Enersonics, Inc.*, Crim. No. 27–53–86 (appeal filed Oct. 2, 1987). Civil litigation involving the Energy Brain promotion with Barr as a defendant has taken place in other jurisdictions. *See e.g., Winkler v. Trico Financial Corp.*, 693 F.Supp. 896 (W.D.Wash.1987).

## II. COUNT III: SECTION 12(2)

Section 12(2) of the Securities Act of 1933 prohibits false or misleading statement of fact in connection with the interstate sale of a security. 15 U.S.C. § 77*l* (2).[3] To prevail on their motion for summary judgment, plaintiffs must show that none of the elements of § 12(2) is factually disputed, and that each is satisfied as a matter of law. The parties agree that the statute has five elements: 1) Whether the item invested in is a security; 2) offered or promoted through interstate commerce or the mail; 3) by oral communication or prospectus; 4) containing untrue statements or omissions of material fact; and 5) and sold by the party against whom liability is asserted.

### A. *Is Energy Brain a Security?*

Plaintiffs argue that principles of collateral estoppel prohibit Barr from disputing that the Energy Brain plan is a security. They say the same issue was resolved against him in *Winkler*, at 899. Plaintiffs also believe the plan fits the definition of an investment contract as a security set

---

**2.** The parties hotly contest the extent of Barr's involvement. Plaintiffs characterize Barr as the creator and controlling party of the entire program, including creation of the Energy Brain plan and the three principal entities which facilitated its operation—Enersonics (the manufacturer of Energy Brains), Saxon Energy Corp. (Saxon) which purchased the units and leased them to investors, and ALH Energy Management Corporation (ALH) which managed the individual units for investors.

Defendants portray Barr's role as more limited. They acknowledge that he offered legal advice to Enersonics during its incorporation and was a corporate officer. They do not dispute that he rendered legal advice in preparing the Energy Brain prospectus and assisted in drafting at least one financial appraisal. They dispute that he had any controlling role in Saxon or ALH, although Saxon shared office space with Barr's law firm.

**3.** Any person who—

   (2) offers or sells a security ..., by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known of such untruth or omission,

shall be liable to the person purchasing such security from him....

15 U.S.C. § 77*l*(2).

forth in *Security and Exchange Commission v. W.J. Howey Co.*, 328 U.S. 293, 299, 66 S.Ct. 1100, 1103, 90 L.Ed. 1244 (1946).[4] Defendants respond that collateral estoppel should not apply since *Winkler* was based on state rather than federal law and relied on unique facts. They also allege that in the present case three of the four *Howey* factors are not established as a matter of law, but involve disputed material facts.

Although *Winkler* reached many of the same issues now before this court, it is not clear that all the elements of collateral estoppel are met. Offensive collateral estoppel may be applied in appropriate circumstances.[5] *Parklane Hosiery Co. Inc. v. Shore*, 439 U.S. 322, 331, 99 S.Ct. 645, 651, 58 L.Ed.2d 552 (1979). Before collateral estoppel may be used in this circuit, the proponent must establish that there was a prior full and fair adjudication on the merits of the same issue now in dispute and that the party against whom estoppel is asserted was a party or privy to the prior action. *See Roach v. Teamsters Local Union No. 688*, 595 F.2d 446, 449 (8th Cir. 1979).

■ The *Winkler* judgment on which plaintiffs rely did determine that Energy Brain is a security under the *Howey* test. The issues are not necessarily identical, however, since *Winkler* ultimately was decided as a matter of Washington state law. It adopted *Howey* only as a guide. *See Winkler* at 898. Furthermore, *Winkler*'s application of *Howey* rested in part on findings specific to those plaintiffs, particularly their passive role in relation to Barr. Finally, plaintiffs have not shown that final judgment has been entered in *Winkler*. For these reasons Barr is not barred by

*Winkler* from asserting here that Energy Brain is not a security.

■ There is no dispute that an investment contract can be a security within the definition set by 15 U.S.C. § 77b.[6] Neither is there a dispute on the first *Howey* element; the parties agree that Energy Brain leases involved an investment of money. The parties dispute at length, however, whether the lease program was a "common enterprise," whether plaintiffs had a reasonable expectation of "profits," and whether plaintiffs could have expected to "derive profits solely from the efforts of others." *Howey*, 328 U.S. at 299, 66 S.Ct. at 1103. There are competing views as to how the record should be viewed. Plaintiffs urge that the focus should be on promotional literature, offering materials, and on the leases, rather than actions or motives of individual plaintiffs. Defendants urge that *Howey* requires an investigation into each plaintiff's circumstances to discern investment motives and expectations.

### 1. Common Enterprise

One measure of common enterprise is a "vertical commonality" approach. *See, e.g., Jenson v. Continental Financial Corp.*, 404 F.Supp. 792, 801 (D.Minn.1975) (common enterprise determined by vertical commonality—the extent to which "the fortunes of the investor are interwoven with and dependent upon the efforts and successes of those seeking the investment or of third parties") (*quoting S.E.C. v. Glen W. Turner Enterprises, Inc.*, 474 F.2d 476 (9th Cir.), *cert. denied*, 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973)). *Cf. Winkler* at 898–99; *Wooldridge Homes, Inc. v. Bronze Tree, Inc.*, 558 F.Supp. 1085,

---

**4.** Under *Howey* an investment contract is a security if there is: 1) an investment of money; 2) in a common enterprise or venture; 3) with a reasonable expectation of profits; 4) derived from the managerial or entrepreneurial efforts of others. *Id.* at 299, 66 S.Ct. at 1103; *See Kansas State Bank v. Citizens Bank of Windsor*, 737 F.2d 1490, 1495 (8th Cir.1984) (loan participation certificate was not a security).

**5.** Offensive collateral estoppel occurs when a party successfully bars a party-opponent from relitigating an issue in which the party-opponent already received an adverse judgment in

another action. *See Parklane Hosiery Co. Inc. v. Shore*, 439 U.S. 322, 331, 99 S.Ct. 645, 651, 58 L.Ed.2d 552 (1979).

**6.** (1) The term "security" means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, *investment contract....*
§ 77b(1) (emphasis added).

1087 (D.Colo.1983). One feature of the Energy Brain program which stands out, even when viewed in the light most favorable to defendants, is the mutual interdependence of all the business entities. Enersonics, of which Barr was a founder and officer, sold the units to Saxon and took a twenty-five year promissory note. Both were therefore dependent upon Saxon's continued viability. Saxon leased the units in exchange for a large percentage of any resulting profits. Profits occurred only if the units were successfully placed and managed. Therefore, even though the extent of Barr's involvement with Saxon and ALH is disputed, and even if plaintiffs in fact were required to place and service their own units, Barr's and Enersonic's success depended on the stability of Saxon, ALH, and a large number of lessees.

Defendants assert that the mutual interdependence between each plaintiff and Barr cannot be measured without discovery. When analyzing whether Energy Brain is a security, however, the court must scrutinize "the economic realities underlying the transaction, and not the name appended thereto." *Kansas State Bank,* 737 F.2d at 1493, *quoting United Housing Foundation Inc. v. Forman,* 421 U.S. 837, 849, 95 S.Ct. 2051, 2059, 44 L.Ed.2d 621 (1975). Defendants portray each transaction as arms-length between prudent business people who assumed all responsibility for their investment's success. This view is not reasonably supported by the record, however, particularly in light of the prospectus and promotion materials, nor by a pragmatic view of the "economic realities underlying the transaction." It is evident as a matter of law and not reasonably disputable that the Energy Brain involved a common enterprise reaching from Barr and Enersonics to each plaintiff.

### 2. *Reasonable Expectation of Profit*

Defendants argue that anticipated tax benefits are not "profits" within the meaning of *Howey.* They assert that some plaintiffs may have expected only a tax benefit from the investment and that the Energy Brain was therefore not a security for them. Plaintiffs respond that the program raised expectations of both tax advantages and participation in energy saving profits. They argue that whether Energy Brain is a security depends on features common to the entire program, not on how individual plaintiffs responded to it.

The issue of whether tax benefits flowing from an investment contract are profits within the meaning of *Howey* is apparently unresolved in this circuit. There is conflicting authority elsewhere.[7] The dispute need not be resolved at this time, however, since Energy Brain offered both a possible tax shelter and a participation in profits.[8] A promise or expectation of income from participation in earnings is a "profit from investments" for purposes of *Howey. Kansas State Bank,* 737 F.2d at 1495 (profit includes the type of earning typically associated with capital appreciation of the item invested in or a participation in the earnings resulting from the investment of funds). *Accord David K. Lindemuth Co. v. Shannon Financial Corp.,* 660 F.Supp. 261, 266 (N.D.Calif.1987). Therefore, taking the pragmatic view encouraged by *Forman,* 421 U.S. at 849, 95 S.Ct. at 2059, it is beyond reasonable dispute that the Energy Brain created in plaintiffs a reasonable expectation of profits from "participation in earnings resulting from the use of investor's funds." *Kansas State Bank,* 737 F.2d at 1495.

### 3. *Profits from the Entrepreneurial or Managerial Efforts of Others*

Defendants argue that Energy Brain is not a security because plaintiffs were re-

---

**7.** *See, e.g., Kolibash v. Sagittarius Recording Co.,* 626 F.Supp. 1173 (S.D.Ohio 1986) (tax benefits were primary inducements for investing and are profits within meaning of *Howey* ); *but see Sunshine Kitchens v. Alanthus Corp.,* 403 F.Supp. 719, 722 (S.D.Fla.1975) (investor's interest in computer leasing agreement as tax shelter resulted in a loss, not a profit); *Newmyer v. Philatelic Leasing Ltd.,* Fed.Sec.L.Rep. (CCH) para. 93,671 (E.D.Mich. February 29, 1988) [available on WESTLAW, 1987 WL 47363] (rejecting *Sagittarius,* held that tax advantages are not profits). *See also Forman,* 421 U.S. at 855, 95 S.Ct. at 2061 (payment of interest consequently deductible for tax purposes is not "profit" under *Howey* ).

**8.** *See, e.g.,* Plaintiffs' Exhibit 7, Prospectus; Plaintiffs' Exhibit 6, Wang letter.

quired to play an active role in placing and managing their unit. *See Schultz v. Dain Corp.*, 568 F.2d 612 (8th Cir.1978); *Fargo Partners v. Dain Corp.*, 540 F.2d 912 (8th Cir.1976) (purchasers of apartment complex had independent responsibility to manage the property; there was no ultimate reliance on the efforts of others). Defendants point to the prospectus, the tax opinion letter, and the leases—all which suggest that each plaintiff was required to operate the unit as a business. This argument is contradicted by the record, however, which clearly reveals that the ultimate control vested in lessees was illusory. Energy Brain was marketed to investors in a package which provided for a service company to assume all managerial responsibilities. Defendants do not dispute that the majority of, if not all, the lessees relied on a management company to place and operate the unit. A commonly-used service company was ALH. Although the court accepts for purposes of this motion Barr's denial of any control over ALH, it is evident that there was at least some affiliation.

The circumstances of this case are analogous to *Howey* where the court found that units of a citrus grove development were securities based upon defendants "offering this opportunity to persons who reside in distant localities and who lack the equipment and experience requisite to the cultivation, harvesting and marketing of the citrus products." *Howey*, 328 U.S. at 299–300, 66 S.Ct. at 1103. *Howey* noted that the definition of security was intended as "a flexible rather than a static principle ... capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Id.* at 299, 66 S.Ct. at 1103. Here the economic realities are that Energy Brain was designed for persons with little interest in taking an active managerial role in energy conservation. Rather, that role was delegated to management

companies, some or all of whom were associated with Barr and Enersonics.

Because the Energy Brain scheme meets each part of the *Howey* definition of a security, plaintiff has met the first element of § 12(2).

### B. *Interstate Commerce or the Mail*

The Energy Brains were offered across the nation, and the units were installed in numerous states. These activities could not have been accomplished without using interstate commerce or the mail. Defendants do not seriously challenge this element of § 12(2).

### C. *Oral Communication or Prospectus*

Extensive written materials were presented to plaintiffs as part of the Energy Brain promotion. These included appraisals, an attorney tax letter, a lease form, and a prospectus. The term prospectus is broadly defined in 15 U.S.C. § 77b(10).[9] Defendants dispute the extent of Barr's involvement in preparing and sending these materials. They do not dispute, however, that the materials were part of the Energy Brain promotion and that Barr at least assisted in drafting the prospectus. Barr's testimony in his New York criminal trial also reveals that he helped draft one appraisal. *See* Plaintiff's Exhibit 1, Transcript p. 4372. The undisputed evidence shows that Energy Brain was marketed by oral communication or prospectus within the meaning of § 12(2).

### D. *Untrue Statements or Material Omissions*

██ Plaintiffs argue that Barr's conviction in New York state court arising from the Energy Brain scheme is dispositive on the issue of misrepresentation. They argue that the criminal conviction establishes beyond a reasonable doubt that Barr intentionally and systematically misrepresented

---

**9.** (10) The term "prospectus" means any prospectus, notice, circular, advertisement, letter, or communication, written or by radio or television, which offers any security for sale or confirms the sale of any security, [with certain exceptions not applicable here].... 15 U.S.C. § 77b(10).

the value of the Energy Brain units.[10] *See* Transcript pp. 4994–95 (jury charge) (Barr charged *inter alia* with misrepresenting the fair market value of the Energy Brain, using fraudulent appraisals, misrepresenting tax savings available, and providing misleading cash flow projections). They argue that collateral estoppel therefore prevents defendants from now denying that misrepresentations occurred for purposes of § 12(2).

Principles of full faith and credit and 28 U.S.C. § 1738 require a federal court to give a state court judgment the same preclusive effect as would be given under the law of the state where the judgment was rendered. *Migra v. Warren City School Dist. Bd. of Education,* 465 U.S. 75, 81, 104 S.Ct. 892, 896, 79 L.Ed.2d 56 (1984). The court therefore looks to New York law to determine if collateral estoppel should apply to the New York conviction. Collateral estoppel is appropriate under New York law when an identical issue was necessarily decided in a prior adjudication on the merits and the party against whom it is asserted had a full and fair opportunity to litigate the issue. *Baxter v. Fulton Ice & Cube Co. Inc.,* 106 A.D.2d 82, 484 N.Y.S.2d 835, 838 (1985).

Defendants argue that the New York trial cannot be dispositive here because it involved representations to people other than the present plaintiffs. The identical misrepresentations are at the heart of both this action and Barr's New York criminal conviction, however. Both involve misrepresentations to Energy Brain investors through false and misleading appraisals, income projections, and product valuations.

The New York conviction was based on the merits of the fraud allegations and that issue was necessarily decided by the conviction. *See* transcript of jury instruction, p. 4997–98, 5000–01. The trial lasted for several weeks; Barr testified and was provided a full and fair opportunity to contest the charges. All of the prerequisites to collateral estoppel are met.

Defendants note that one factor to consider in weighing the fairness of applying collateral estoppel to a criminal conviction is the pendency of an appeal. *Duverney v. New York,* 96 Misc.2d 898, 410 N.Y.S. 237, 242 (1978) *aff'd* 76 A.D.2d 962, 429 N.Y.S. 2d 70 (1980). Barr's appeal of his conviction does not necessarily preclude collateral estoppel, however. 18 Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction § 4465, n. 36. Defendants have not articulated any compelling reason why it would be unfair to rely on the lengthy trial, and a conviction based on the strictest standard of proof, to preclude relitigation of the same issue in a civil matter. Barr's New York conviction has established that Energy Brains were promoted through communications containing untrue statements of fact or material omissions.

### E. *Whether Barr Was a Seller of Energy Brain*

■ The Eighth Circuit definition of a "seller" of securities under § 12 has included one who is in privity with the purchaser or whose participation was a "substantial factor" in the buy-sell transaction. *Stokes v. Lokken,* 644 F.2d 779, 785 (8th Cir.1981). The substantial factor test was recently rejected by the Supreme Court, however, because it imposed liability beyond those who solicit securities sales for financial gain. *Pinter v. Dahl,* —— U.S. ——, 108 S.Ct. 2063, 2076–80, 100 L.Ed.2d 658 (1988) (no statutory authority to extend seller liability under § 12 beyond the principals to the transaction and their agents who derive profit from the sale). The substantial factor test was criticized for exposing persons, such as accountants and lawyers acting in their professional capacities, to strict liability when the "buyer does not in any meaningful sense purchas[e] the security" from them. *Pinter,* 108 S.Ct. at 2081. The Court stated that § 12 was not intended to impose liability against those who offer gratuitous advice and whose "sole motiva-

10. Plaintiffs also assert that Barr engaged in misrepresentations and material omissions regarding the independence of the appraisers Fereg and Wang; the interrelatedness of corporate management of the principal entities; the degree of management exercised by the principals; and the risks inherent in the investment program.

tion is to benefit the buyer." *Id.* at 2078. "Seller" liability under § 12 is properly imposed, however, against the person who passes title to the security and also to securities issuers and brokers who successfully solicit a purchase. *Id.* at 2076.

Under the *Pinter* standard, liability may be imposed against Barr and Enersonics if they were principals to the sale or otherwise assisted in the transfer of securities as brokers, and received financial benefit in return. The measure of privity is unchanged; plaintiffs need not show direct contact between the "seller" and ultimate buyer of the security. *Id.*, at 2076, *see also Wasson v. Securities and Exchange Commission*, 558 F.2d 879, 886 (8th Cir.1977) (securities transactions typically involve intermediaries between issuer and purchaser; that does not insulate the issuer from liability).

Here Barr has acknowledged his role as an early sponsor and officer of Enersonics. He assisted with financial appraisals and helped draft a prospectus which was distributed to prospective buyers. This undisputed evidence and the transcript of Barr's New York criminal conviction show that he was the creator and principal proponent of the Energy Brain program nationally and a seller of the Energy Brain securities for purposes of § 12(2).

### F. Defenses to § 12(2) Liability

■ Plaintiffs have shown all the *prima facie* elements of a claim under § 12(2) and assert that they are entitled to summary judgment on count III of the second amended complaint. Defendants argue

that they have factually-based affirmative defenses which preclude judgment at this time. They argue that the one year limitations period in 15 U.S.C. § 77m [11] begins to run as soon as a plaintiff has sufficient knowledge to be on inquiry notice of the possible misrepresentation. *Cook v. Avien, Inc.*, 573 F.2d 685, 696 (1st Cir. 1978). Their position is that the notice time for each plaintiff, as well as the issue of due diligence, cannot be resolved until discovery is completed. *See Antinore v. Alexander & Alexander Services, Inc.*, 597 F.Supp. 1353, 1357 (D.Minn.1984), *affirmed Re Flight Transp. Corp. Securities Litigation*, 825 F.2d 1249 (8th Cir.1987), *cert. denied, Lund v. Norwest Bank of Minneapolis,* —— U.S. ——, 108 S.Ct. 1113, 99 L.Ed.2d 273 (1988) (whether plaintiffs exercised due diligence requires factual inquiry). Plaintiffs did not address this issue in their materials.

Although plaintiffs have made a prima facie case of violation of § 12(2), liability on these claims cannot be resolved until the defenses of the statute of limitations and due diligence are ripe for decision on an adequate record.[12] Accordingly, plaintiffs motion for summary judgment on behalf of all plaintiffs on count 3 must be denied.

### III. COUNT VII: MINN.STAT § 80A.08

■ Plaintiffs assert that Barr and Enersonics violated Minn.Stat. § 80A.08 by selling unregistered securities in the state.[13] Defendants have not contested that Energy Brains were not registered as securities while being offered and sold in Minnesota. They respond, however, that

**11.** No action shall be maintained to enforce any liability created under section 77k or 77*l* (2) of this title unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence, or, if the action is to enforce a liability created under section 77*l* (1) of this title, unless brought within one year after the violation upon which it is based. In no event shall any such action be brought to enforce a liability created under section 77k or 77*l* (1) of this title more than three years after the security was bona fide offered to the public, or under section 77*l* (2) of this title more than three years after the sale.

15 U.S.C. § 77m

**12.** The court has previously noted that the date when the statute begins to run depends upon actual or constructive discovery of the untrue statement. *Nielsen v. PFM,* 682 F.Supp. at 438 (D.Minn.1987).

**13.** It is unlawful for any person to offer or sell any security in this state unless (a) it is registered under sections 80A.01 to 80A.31 or (b) the security or transaction is exempt under section 80A.15.

Minn.Stat. § 80A.08 (1973).

Energy Brain is not a security because at least some investors did not have a profit motive. They assert also that Barr is not a seller of securities under Minnesota law.

Minn.Stat. § 80A.23 provides a civil remedy for purchasers of unregistered securities in Minnesota. The definition of security includes investment contracts such as the Energy Brain. *See* Minn.Stat. § 80A.14 subd. 18(a).[14] *See State v. Investors Security Corp.*, 297 Minn. 1, 209 N.W. 2d 405, 410 (1973) (use "broad and flexible" definition to identify an investment contract as a regulated security).

Minnesota courts look to the *Howey* definition as a useful guide in identifying whether an investment contract is a security, although they have declined to adopt it as the exclusive definition. *Investors Securities Corp.*, 209 N.W.2d at 410. As discussed above, the Energy Brain program fits within the *Howey* definition and is therefore a security under Minnesota law.

Minnesota has also adopted the Eighth Circuit definition of "seller." *See Anders v. Dakota Land and Development Co., Inc.*, 380 N.W.2d 862, 868 (Minn.App.1986). Therefore the same measures of "privity" and the factors indicating that Barr is a seller under *Pinter* apply under Minnesota law in determining liability for sellers of securities. *See Anders*, 380 N.W.2d at 866. As noted above, Barr played a leading role in the offer and sale of the Energy Brain securities. He is therefore seller of securities under § 80A.08.

Plaintiffs have made out a prima facie case that Barr violated Minn.Stat. 80A.08, and defendants have raised no reasonable factual disputes or affirmative defenses.

Plaintiffs are therefore entitled to summary judgment on count VII.

## IV. COUNT XV: NEGLIGENCE PER SE

■ Count XV alleges negligence *per se* under Minnesota law for conduct allegedly in violation of Internal Revenue Code, 26 U.S.C. § 6700(a)(2)(B).[15] Plaintiffs argue that *United States v. Turner*, 601 F.Supp. 757 (E.D.Wis.1985) *aff'd* 787 F.2d 595 (7th Cir.1986), establishes that the Energy Brain is an abusive tax shelter. For violation of this statute plaintiffs contend that defendants should therefore be found negligent *per se* under Minnesota law. *Hofbauer v. Northwestern National Bank of Rochester*, 700 F.2d 1197, 1201 (8th Cir. 1983) (Minnesota state courts might find negligence for violation of federal statute).[16]

For several reasons, however, plaintiffs are not entitled to summary judgment on this claim. There is no showing that the *Turner* litigation involved these defendants, nor has Barr apparently ever been found to have violated § 6700. Furthermore, not every violation of a statute constitutes negligence. *Johnson* 320 N.W.2d at 897. Plaintiffs have not shown that the statute upon which they rely provides for a private right of action, nor is it a safety statute for which the *per se* negligence doctrine is more typically appropriate. Finally, even if negligence *per se* were established, there is insufficient development of the issues of causation and damages.

## ORDER

Accordingly, based upon the above, and all the files, records, and proceedings herein, IT IS HEREBY ORDERED that:

---

**14.** Subd. 18. Security. (a) "Security" means any note; stock; treasury stock; bond; debenture; evidence of indebtedness; certificate of interest or participation in any profit sharing agreement; collateral trust certificate; preorganization certificate or subscription; transferable shares; *investment contract;* Minn.Stat. § 80A.14 subd. 18(a) (emphasis added).

**15.** § 6700(a)(2)(B) permits imposition of a fine against promoters of abusive tax shelters by prohibiting the: "mak[ing] or furnish[ing] ... a gross valuation overstatement as to any material matter."

**16.** Violation of a statute can be negligence *per se* under Minnesota law when the statute's purpose is:

1) to protect the class of persons whose interest is invaded;

2) to protect the particular interest invaded.

3) to protect against the kind of harm which resulted; and

4) the injury was proximately caused by the harm which the statute intended to prevent. *See Johnson v. Farmers & Merchants State Bank*, 320 N.W.2d 892, 897 (Minn.1982) (*citing* Restatement (Second) of Torts § 286 (1965)).

1. Plaintiffs' motion for partial summary judgment against defendants Sheldon P. Barr and Enersonics, Inc., on counts III, and XV of the second amended complaint, is denied.

2. Plaintiffs' motion for summary judgment against defendant Barr on count VII for violation of Minn.Stat. § 80A.08 is granted.

3. Plaintiff's motion for summary judgment on count VII against defendant Enersonics, Inc. is granted.