Richard COAN as Trustee for Estate of HITK Financial Group, Inc.

v.

BELL ATLANTIC SYSTEMS LEASING INTERNATIONAL, INC., et al.

Civ. No. N–89–322(AHN).

United States District Court, D. Connecticut.

Nov. 20, 1990.

Richard M. Coan, Coan, Lewendon & Royston, New Haven, CT, Stuart D. Perlman, Perlman & Horvitz, Chicago, IL, for plaintiff.

Sanford M. Aderson, Aderson, Frank & Steiner, Pittsburgh, PA, David L. Belt, Alice S. Miskimin, Jacobs, Grudberg, Belt & Dow, P.C., New Haven, CT, Norman M. Block, Spengler, Carlson, Gubar, Brodsky & Frischling, New York City, Linda M. Fogler, Law Offices of Linda M. Fogler, Milford, CT, Robert A. Izard, Jr., Robinson & Cole, Erin Marie Kallaugher, Mark B. Seiger, Halloran & Sage, Scott P. Moser, Day, Berry & Howard, Hartford, CT, Frank J. Silvestri, Jr., Zeldes, Needle & Cooper, Bridgeport, CT, Richard Paul Swanson, Reid & Priest, New York City, Kathleen C. Stone, Boston, MA, Lawrence Wallach, Tacoma, WA, for defendants.

NEVAS, District Judge.

After review and over objections, the Magistrate's Recommended Ruling is ratified and approved.

So Ordered.

## RECOMMENDED RULING ON PENDING MOTIONS

MARGOLIS, United States Magistrate Judge.

Plaintiff Richard M. Coan is the duly appointed Trustee for the Estate of HITK Financial Group, Inc. ["HITK Financial"], a Connecticut corporation which has filed a bankruptcy petition pending in the United States Bankruptcy Court for the District of Connecticut, Case No. 5–87–961. On July 6, 1989, Coan commenced this action which arises out of a complicated two-tiered sale/leaseback arrangement for computer equipment against eleven defendants involved in this transaction. These defendants include Bell Atlantic Systems Leasing International, Inc. ["BASLI"], a New York corporation with its principal place of business in Phoenix, Arizona (Complaint ¶ 6) and JMA Leasing Corp., a Delaware corporation with its principal place of business in New York, New York or East Haddam, Connecticut (id. ¶ 7), with whom HITK Financial entered into this arrangement.[1]

The three other corporate defendants include: Equitable Leasing Company, Inc. ["Equitable"], a Delaware corporation with its principal place of business in New York City, which is JMA's parent corporation (id. ¶ 8); GICC Capital Corp. ["GICC"], a Delaware corporation with its principal place of business in New York City, and Matrix Leasing Corp. ["Matrix"], a Delaware corporation with its principal place of business in New York City or Dallas, Texas, both of which are affiliated with JMA and Equitable (id. ¶¶ 11–12). Six individuals also are named as defendants: Wayne U. Smith, an Arizona resident who is an officer of defendant BASLI and who negotiated the transaction at issue here (id. ¶ 16); Stanley Scheinman, a Connecticut resident with an office in Manhasset, New York, who was the executive vice president and chief oper-

1. On February 23, 1988, BASLI commenced an action against HITK Corporation, the parent company of HITK Financial. Civ. No. B88–109(AHN) ["BASLI Action"]. The complaint here, in the N89–322(AHN), closely parallels HITK's Third Amended Counterclaim, filed October 16, 1989, in the BASLI Action. The numerous dispositive motions in the BASLI Action are discussed in a separate recommended ruling, also filed today, familiarity with which will be presumed. Details of the underlying transaction are provided in that ruling. This action and the BASLI Action have been consolidated. (See Dkt. ## 66–67).

ating officer of HITK and an officer of HITK Financial until March 1987 (*id.* ¶ 13); Jeffrey Auslander, a resident of Pittsburgh, Pennsylvania, who served as a vice president of HITK and HITK Financial until March 1987 (*id.* ¶ 14); Joel Hasen, a New York resident who served as counsel for certain parties to this transaction (*id.* ¶ 15); Joel Mallin, a New York resident who is the sole shareholder of Equitable and the controlling person of JMA and Equitable (*id.* ¶ 9); and Richard Gangel, a New York resident who is an owner and chief executive officer of GICC and Matrix (*id.* ¶ 10). The complaint traces in great detail the events occurring in the latter half of 1986 which culminated in a closing held in late December 1986 (*id.* ¶¶ 28–46), as well as the events which occurred thereafter (*id.* ¶¶ 47–65). The complaint rests on four counts—violation of § 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 (First Count); violation of § 12(2) of the Securities Act of 1933 against defendants BASLI, JMA, Matrix, GICC, Smith, Mallin and Gangel only (Second Count); common law fraud and deceit (Third Count); and negligent misrepresentation (Fourth Count).

## I. PENDING MOTIONS

There are six motions pending here. On December 22, 1989, JMA, Equitable, Matrix, GICC, Mallin and Gangel [collectively "the JMA Parties"] filed a motion to dismiss, on a variety of grounds.[2] (Dkt. ## 31–32). Similar motions were filed on January 8, 1990 and January 10, 1990 by Scheinman and Auslander,[3] respectively.

2. Attached to this brief were two affidavits, one by Mallin ("Mallin Aff't") and another from Gangel ("Gangel Aff't").

3. Auslander's motion also seeks a bond pursuant to Conn.Gen.Stat. § 33–320a(c).

4. This brief incorporates by reference the memorandum and affidavit filed by HITK in the *BASLI* Action (Dkt. ## 203–04). Attached as exhibits to HITK's brief were excerpts from previous rulings in that action. Also filed was an affidavit, dated January 29, 1990 from Stuart Perlman, counsel for HITK and Coan. Various exhibits were attached, including Exhs. A(a)–A(f) & B, all of which concern the securities issues; Exhs. D(a)–D(e), with respect to person-

(Dkt. ## 34–35, 39–40). Plaintiff Coan filed his brief in opposition to these motions on January 31, 1990. (Dkt. # 45).[4] On February 26, 1990, Smith filed a motion to dismiss or for more particular statement, with two exhibits[5] (Dkt. ## 49–50). Lastly, on March 21, 1990, Hasen filed his motion to dismiss (Dkt. ## 54–55). Coan filed his brief in opposition to both these motions on April 10, 1990. (Dkt. # 59). Hasen and Smith filed reply briefs on April 20, 1990 and April 30, 1990, respectively. (Dkt. ## 61–62).[6] On January 8, 1990, Scheinman also filed a motion for more definite statement. (Dkt. ## 36–37).

Lengthy oral argument was held on these motions and on the similar motions pending in the *BASLI* Action on June 18, 1990.

## II. DISCUSSION

■ In ruling on a motion to dismiss, the court presumes all factual allegations of the complaint to be true and makes all reasonable inferences in favor of the opposing party. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1959) (footnote omitted).[7]

The ten defendants raised a variety of arguments, only some of which need to be addressed in this ruling.

al jurisdiction over JMA; and Exh. E, with respect to personal jurisdiction over Equitable.

5. These exhibits are his affidavit (Exh. A) and a copy of his Notice and Acknowledgment of Receipt of Summons and Complaint (Exh. B).

6. As to Smith's motion for more definite statement, plaintiff Coan sought an extension of time until twenty-one days after the issuance of this ruling; said motion was granted, absent objection, on April 16, 1990. (*See* Dkt. # 58).

BASLI, the remaining defendant, filed its answer on January 10, 1990. (Dkt. # 38).

7. *See* notes 9 & 18 *infra*.

## A. FIRST AND SECOND COUNTS

### 1. No "Security" is Involved

The JMA Parties, Scheinman, Auslander and Smith argue that Coan's first and second counts should be dismissed, as no "security" is involved here. "Security" is defined in § 3(a)(10) of the Securities and Exchange Act of 1934 as follows:

The term "security" means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit, for a security, ... or, in general, any interest or instrument commonly known as a "security," or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of or warrant or right to subscribe to or purchase, any of the foregoing.

. . . . .

15 U.S.C. § 78c(a)(10). The United States Supreme Court just recently "reaffirm[ed]" that the definition of "security" in the 1934 Act "is virtually identical" to that found in the 1933 Act, so that for "present purposes, the coverage of the two Acts may be considered the same." *Reves v. Ernst & Young*, 494 U.S. 56, 61 n. 1, 110 S.Ct. 945, 949 n. 1, 108 L.Ed.2d 47 (1990).

Coan is correct that the term "security" was defined in "sufficiently broad and general terms so as to include within that definition the many types of instruments that in our commercial world fall within the ordinary concept of a security." *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 847–48, 95 S.Ct. 2051, 2058, 44 L.Ed.2d 621 *reh. denied*, 423 U.S. 884, 96 S.Ct. 157, 46 L.Ed.2d 115 (1975) (citation omitted) ("*Forman*"). "In searching for the meaning and scope of the word 'security' in the Act, form should be disregarded for substance and the emphasis should be on economic reality." *Id.* 421 U.S. at 848, 95 S.Ct. at 2058 (citations omitted). As the United States Supreme Court recently observed in *Reves, supra:*

In defining the scope of the market that it wished to regulate, Congress painted with a broad brush.... Congress therefore did not attempt precisely to cabin the scope of the Securities Acts. Rather, it enacted a definition of "security" sufficiently broad to encompass virtually any instrument that might be sold as an investment.... Congress' purpose in enacting the securities laws was to regulate *investments,* in whatever form they are made and by whatever name they are called.

494 U.S. at 61, 110 S.Ct. at 949 (emphasis in original) (footnote & citations omitted). The broad definition of "security" reflects the remedial nature of the securities legislation passed by Congress. *Tcherepnin v. Knight,* 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967). Given the creativity of those who commit securities fraud, the definition of security

embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits.

*S.E.C. v. W.J. Howey Co.,* 328 U.S. 293, 299, 66 S.Ct. 1100, 1103, 90 L.Ed. 1244 *reh. denied,* 329 U.S. 819, 67 S.Ct. 27, 91 L.Ed. 697 (1946) ("*Howey* "); *Yoder v. Orthomolecular Nutrition Institute, Inc.,* 751 F.2d 555, 558 (2d Cir.1985) (Congress intended this legislation to reach "[n]ovel, uncommon, or irregular devices, whatever they appear to be, ... if it be proved as a matter of fact that they were widely offered or dealt in under terms or courses of dealing which established their character in commerce as 'investment contracts' ...") (citation omitted). The federal securities acts did not embody a Congressional intention "to provide a broad federal remedy for all fraud." *Reves, supra,* 494 U.S. at 61, 110 S.Ct. at 949 (citation omitted).

In 1946, the United States Supreme Court issued the *Howey* decision, regarding an investment scheme whereby individuals purchased a small portion of a 500–acre orange grove and then entered into a service contract to return to the promoters a

ten-year leasehold interest in the land; under this contract, the promoters were given unbridled discretion in cultivating and marketing the citrus crop. The *Howey* decision established a five-part test for determining a "security" for purposes of the federal securities law as follows: a transaction whereby a person [1] invests his money [2] in a common enterprise and [3] is led to expect profits [4] solely from the efforts of the promoter or a third party and [5] risks loss. *Howey, supra,* 328 U.S. at 298–99, 66 S.Ct. at 1103; *Connors v. Lexington Ins. Co.,* 666 F.Supp. 434, 439 (E.D.N.Y.1987) (citations omitted).[8] All five factors must be satisfied.

The *Howey* decision was discussed extensively in *Forman,* which involved the purchase of shares of stock entitling a purchaser to lease an apartment in Co-op City, the "massive housing cooperative" in New York City. 421 U.S. at 840, 95 S.Ct. at 2055. The *Forman* decision described the touchstone of the *Howey* test as "the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others." 421 U.S. at 852, 95 S.Ct. at 2060. Such a profit-motivated investment was distinguished from a transaction in which the investor purchases an item for his/her own use, or with the intention of developing it himself/herself, independently of the promoter. *Id.* at 852–53, 95 S.Ct. at 2060; *Howey, supra,* 328 U.S. at 300, 66 S.Ct. at 1103 (sale/leaseback of orange groves involved a security, as transfer of rights in land was merely incidental, and investors had no desire to occupy land or use it themselves); *S.E.C. v. Joiner Corp.,* 320 U.S. 344, 348–49, 64 S.Ct. 120, 122, 88 L.Ed. 88 (1943) (security involved where investors were attracted by promoter's agreement to drill a test well, which gave to the instruments

"most of their value and all of their lure" and without which offer would have been of naked leasehold rights). *Cf. Reves, supra,* 494 U.S. at 66, 110 S.Ct. at 951–52 (under family resemblance test for determining if a note is a security, motivations of buyer are assessed to determine if his/ her primary interest is in expected profit, and reasonable expectations of the investing public are examined as well).

In *Forman,* the plaintiffs-purchasers "were interested in acquiring housing rather than making an investment for profit," and thus the transaction was held to be outside the scope of the federal securities laws despite the sale of what was denominated "stock" by the promoters. *Forman, supra,* 421 U.S. at 860, 95 S.Ct. at 2064. The *Forman* Court acknowledged that the transaction involved a possibility of income flowing to the "investors" and reducing their rental fees, and that such income was conceptually

> the kind of profit traditionally associated with a security investment. But in the present case this income—if indeed there is any—is far too speculative and insubstantial to bring the entire transaction within the Securities Act. ... [I]nvestors were not attracted to Co-op City by the offer of these potential rental reductions. Moreover, nothing in the record suggests that the facilities in fact return a profit in the sense that the leasing fees are greater than the actual cost to Co-op City of the space rented. ... [T]he possibility of some rental reduction is not an "expectation of profit" in the sense found necessary in *Howey.*

*Id.* (citations omitted). *See also Reves, supra,* 494 U.S. at 68 n. 4, 110 S.Ct. at 952 n. 4 (refusing to extend *Howey*'s restrictive definition of profits as either capital appreciation or a participation in earnings). Under *Forman,* the investor must be attract-

---

8. Some courts refer to *Howey*'s four-prong test, omitting the fifth element. *See, e.g., In re Professional Financial Management, Ltd.,* 692 F.Supp. 1057, 1060 n. 4 (D.Minn.1988); *Department of Economic Development v. Arthur Andersen & Co. (U.S.A.),* 683 F.Supp. 1463, 1472 (S.D.N.Y.1988). Other courts refer to a three-prong test which combines the third and fourth elements and omits the fifth element. *See, e.g.,*

*Albanese v. Florida National Bank of Orlando,* 823 F.2d 408, 410 (11th Cir.1987); *Kaplan v. Shapiro,* 655 F.Supp. 336, 339 (S.D.N.Y.1987); *In re Energy Systems Equipment Leasing Securities Litigation,* 642 F.Supp. 718, 734 (E.D.N.Y. 1986); *Kolibash v. Sagittarius Recording Co.,* 626 F.Supp. 1173, 1176 (S.D.Ohio 1986); *Sunshine Kitchens v. Alanthus Corp.,* 403 F.Supp. 719, 720–21 (S.D.Fla.1975).

ed to the transaction by the promise of a reasonably expectable return on his/her investment, rather than a desire to attain other rights which are incident to the ownership of the item offered. 421 U.S. at 852–53, 95 S.Ct. at 2060–61; *Howey, supra,* 328 U.S. at 300, 66 S.Ct. at 1103; *Joiner, supra,* 320 U.S. at 348, 64 S.Ct. at 122.

 There is little doubt that a guaranty, in and of itself, does not constitute a "security" under the federal securities law, as a guaranty is not an investment of money but rather "an agreement to repay a loan to the lender should the borrower default." *James v. Meinke,* 778 F.2d 200, 204–05 (5th Cir.1985). That is exactly what HITK is alleged to have done here.

### a. *"HOWEY" FACTORS*

Other courts, however, do not view the guaranty in isolation but rather survey "the entire transaction, including the guarantee" to see whether it "falls within the statutory definition of a security." *Johns Hopkins University v. Hutton,* 326 F.Supp. 250, 255 n. 8 (D.Md.1971). When a sale/leaseback transaction is alleged to have involved securities fraud, the appropriate analysis is to apply the *Howey* factors to determine whether a security has been offered or sold in the form of an investment contract. *Reves, supra,* 494 U.S. at 64, 110 S.Ct. at 951; *Forman, su-*

*pra,* 421 U.S. at 851–52, 95 S.Ct. at 2060; *Howey, supra,* 328 U.S. at 297, 66 S.Ct. at 1102. As Coan's complaint seeks to attack the transaction as a package, it is appropriate for this Court to analyze the entire sale/leaseback arrangement in this context.[9]

Federal courts have reached differing conclusions as to whether sale/leaseback arrangements constitute securities. Six courts have concluded that the federal securities law do apply to such transactions, *see Albanese v. Florida National Bank of Orlando,* 823 F.2d 408 (11th Cir.1987) (ice machines); *In re Professional Financial Management, Ltd.,* 692 F.Supp. 1057, 1059–62 (D.Minn.1988) (energy systems); *Nevyas v. Spartan Equipment Co., Inc.,* 1987 WL 13381, 1987 U.S.Dist. LEXIS 6010 (E.D.Pa.1987) (computer equipment); *David K. Lindemuth Co. v. Shannon Financial Corp.,* 660 F.Supp. 261, 265–66 (N.D.Cal.1987) (petroleum service equipment); *In re Energy Systems Equipment Leasing Securities Litigation,* 642 F.Supp. 718, 732–39 (E.D.N.Y.1986) (energy systems); *Kolibash v. Sagittarius Recording Co.,* 626 F.Supp. 1173 (S.D. Ohio 1986) (records), while three have held that there are no securities implications to such transactions, *see Hart v. Pulte Homes of Michigan Corp.,* 735 F.2d 1001 (6th Cir.1984) (model homes in subdivision); *Federal De-*

---

**9.** Coan has submitted various documents in support of his argument that the federal securities laws were implicated in this transaction. *See* note 4 *supra.* The "Investment Proposals" prepared by BASLI both contain the following disclaimer:

*Possible Securities Implications*
While BASLI does not believe that the sale/leaseback activity constitutes a securities offering, care is being taken to insure that full and adequate disclosure of the business and tax risks is made to the Purchaser, and that the Purchaser receives information on BASLI (including financial statements as of December 31, 1987 (audited) and September 30, 1986 (unaudited)) so that BASLI will have complied with the Regulation D or Section 4(2) private placement exemption from registration if the activity should be deemed to constitute a securities offering.
(Exhs. A(a) & A(b), at 5). BASLI's Form D submission to the Securities and Exchange Commission and to the Arizona Corporation Commission contained a similar disclaimer:

Information is being provided herein and this Form D is being filed to preserve the exemption from registration available under Regulation D were the transaction to which this form D relates deemed to involve the offer or sale of a security and Bell Atlantic Systems Leasing International, Inc. deemed to be an issuer with respect thereto. Bell Atlantic Systems Leasing International, Inc. hereby expressly disclaims that it has issuer status with respect to such transaction or that such transaction involves the offer or sale of a security. (Exh. A(d) §§ D & E).

In light of these express disclaimers by BASLI, such documents shed no light on the legal issue before this Court. As such, the Court has excluded them from consideration, so that with respect to this issue, this motion need not be converted from a motion to dismiss under Rule 12(b)(6) to a motion for summary judgment under Rule 56. *See generally Krijn v. Pogue Simone Real Estate Co.,* 896 F.2d 687, 689–90 (2d Cir.1990).

posit Insurance Corp. v. Eagle Properties, Ltd., 664 F.Supp. 1027, 1046–48 (W.D.Tex.1985) (commercial office building and adjacent parking lot); Sunshine Kitchens v. Alanthus Corp., 403 F.Supp. 719 (S.D.Fla.1975) (computer equipment). It is not the volume of authority which governs here, however, but the applicability of the various analyses utilized.

The first and last factors of the Howey test, i.e., investing money and risking loss, seldom pose any controversy. It is the middle three (and often overlapping) elements, namely commonality, expectation of profits, and sole efforts of the promoter or third party, which are the subject of judicial decisions. In virtually all judicial applications of these factors, including this ruling, such elements cannot be discussed in total isolation from one another. Instead, it frequently is the interplay between the elements which controls the outcome.

#### i. Commonality

■ Commonality is the most disputed of all the Howey factors, as there are divergent views as to what this factor entails. The confusion is particularly compounded in this Circuit, in that even within the Southern District of New York, decisions have employed at least four different approaches. In Department of Economic Development v. Arthur Andersen & Co. (U.S.A.), 683 F.Supp. 1463 (S.D.N.Y.1988) ("Andersen"), filed by a British governmental agency against an accounting firm for its allegedly fraudulent financial statements prepared for John DeLorean's corporations, the court summarized this conundrum as follows:

> Some courts have found that there must be a "pooling of the monies of the various investors." ... This requirement, known as "horizontal commonality," is not satisfied by a transaction solely between a promoter and a single investor. Other courts have found that such a one-to-one relationship is sufficient, provided that the promoter and the investor share

the successes and failures of the venture. This requirement, known as "narrow vertical commonality," is met by a showing of "a tie between the fortunes of the investor and the investment's promoter such that these fortunes rise and fall together." ... Finally, some courts have gone even further and found that the promoter's fortunes need not be linked with the investor's. Under this requirement of "broad vertical commonality," the plaintiff need show only that the fortunes of the investors are tied to the efforts of the promoter....

Id. at 1473 (citations omitted).[10] The Andersen court employed a fourth hybrid test, holding that either horizontal or narrow vertical commonality satisfies the "common enterprise" requirement. Id. (citations omitted). But see Yoder, supra, 751 F.2d at 588 (suggesting that the Second Circuit requires horizontal rather than vertical commonality).

Two cases which applied the horizontal commonality test found that the sale/leaseback arrangement was not a security. The case whose facts are most similar to those here is Sunshine, supra, involving computer equipment. As only the "unitary contract" between the parties was involved, with no pooling between the investment of the plaintiff and others, horizontal commonality was not found. 403 F.Supp. at 721–22.[11] Hart, supra, concerned the purchase of twenty-three different model homes within several subdivisions, each of which were sold to separate investors and then leased back to the developer. As each investor made his or her own purchase of a model home, "the fate of each purchaser's investment was [not] tied to that of the other investors through a common scheme." 735 F.2d at 1004. It did not matter that the same assurances were given to each investor. Id. The Court thus concluded that plaintiffs had not invested in a common enterprise, because "their in-

---

**10.** The "broad vertical commonality" approach has been met with criticism. Id. at 1473 n. 9 (citation omitted).

**11.** The Sunshine court also found that narrow vertical commonality was absent, as the inves-

tor's tax benefits might increase should the promoters' management efforts fail. 403 F.Supp. at 722. See pp. 937–938 infra.

vestment of funds and the risk they undertook were not linked each with the other." *Id.* at 1005. The same conclusion was reached in *Kolibash, supra,* under which the defendant purchased, through financing, "master recordings" from which phonographs, tapes and cassettes are manufactured. Defendant then leased these master recordings to the investors/lessees for a substantial amount of cash. Each investor/lessee was then obligated to promote his or her own recording and to pay defendant a certain percentage of the net proceeds from exploitation of the master recording. As each investor acted independently, the court found there was no horizontal commonality because "the transaction can be fairly described as unitary in nature ..." 626 F.Supp. at 1177.[12]

This action is similar to *Sunshine* and *Hart* in that HITK Financial was the sole investor involved, so that its investment of funds were not linked to any other investors. Therefore, there is no horizontal commonality here.[13]

The narrow verticality test requires greater scrutiny. In *Lindemuth, supra,* the defendant broker Shannon purchased petroleum service equipment from its manufacturer NDT and then leased it to NDT's affiliate company, OTI, under a Master Lease Agreement. 660 F.Supp. at 263. Shannon, in turn, found investors, including plaintiffs, to buy the equipment and then lease it back to OTI, with Shannon assigning its rights under the Master Lease to the investors. As plaintiffs financed the purchase, OTI's lease payments were supposed to exceed the investors' debt service of their loans. *Id.* Thus, the plaintiffs expected income from OTI's lease payments to them and profits from the sale or release of the equipment at the end of the term, as well as tax benefits from the transaction. Several months later, OTI defaulted on its lease payments. The court

found that the profits of both Shannon and plaintiffs depended on the value of the equipment at the end of the lease term. *Id.* at 266. It concluded that "[t]his correlation in fortunes is enough for plaintiffs to avoid summary judgment on the common enterprise issue." *Id.* Like the *Lindemuth* plaintiffs, HITK Financial did have an interest in the value of the equipment at the end of the lease term; however, this interest was not particularly significant to the overall purposes of the transaction. Coan has not alleged that HITK Financial relied on promises of either end of term or monthly profits when it agreed to this transaction. Thus, it has not alleged facts which make *Lindemuth*'s finding of vertical commonality analogous.

In *Energy Systems, supra,* the plaintiffs entered into long term leases with the defendant-promoter for "Energy Control Systems," valued between $65,000 and $280,000, which essentially were electronic switches to turn electricity on or off according to a schedule. 642 F.Supp. at 724. The investors also were to enter into a service agreement with an affiliated service company, which would locate an appropriate end-user for the energy system. *Id.* In addition to the tax benefits, the investors anticipated a large income stream from the end-user based upon the end-user's significant energy savings. *Id.* In their lawsuit, plaintiffs argued that the systems were worth no more than $3,000 each and could not generate the income stream represented by defendants. *Id.* The court characterized the narrow verticality test as "requir[ing] not only an interweaving between the *efforts* of the promoter and the fortune of the investors, but also a direct relationship between the *success* of the promoter and that of the investors, *i.e.,* the fortunes of the promoters and investors must rise and fall together." *Id.*

---

12. The court did find that vertical commonality was present. *See* note 15 *infra.*

13. In *Energy Systems, supra,* a case consolidated for pretrial purposes by the Judicial Panel on Multidistrict Litigation, the court found that horizontal commonality was present, in that

"[t]he success of this entire scheme ... was dependent on the receiving of pre-paid funds from investors that could be pooled so as to finance the very operation of the scheme." 642 F.Supp. at 736–37. The underlying facts in *Energy Systems* are found in the discussion of narrow vertical commonality on pp. 937–938.

at 735 (citations omitted). The court found that this requirement was easily met:

> The investors' fortunes were inextricably and directly tied to both the efforts and fortunes of the promoters. The promoters' profits and any return on their investments that investors might achieve were both ultimately dependent upon and would vary with the successful location and profitability of appropriate end-users for the Systems. While the promoters might still receive rental payments from investor-lessees even if the Systems were not successfully marketed to end-users, the promoters and investors both required such rentals to end-users in order to realize any profits from the venue sharing arrangements between the promoters, service companies, and investors as to the income stream generated by the energy savings of the end-users.

*Id.* at 736.

This case is again distinguishable from *Energy Systems*, in that HITK Financial's primary goal in entering into the arrangement at issue here was not to purchase the computer equipment at the conclusion of the lease terms, but rather to gain substantial tax benefits. Although a potential profit or loss might have resulted from defendants' management abilities over the term of the lease, the promoters and investors were not "both ultimately dependent ... upon the successful location and profitability of appropriate end-users" for the computer equipment. There simply were not any "revenue sharing arrangements" here between BASLI, JMA, and HITK Financial.[14]

Thus, in light of these decisions, the Court finds that Coan has not satisfied either the horizontal or vertical commonality test.

### ii. Expectation of Profits

■ There is also caselaw with respect to whether an investor in these sale/leaseback arrangements has an expectation of profits.[15] The parties here euphemistically refer to their arrangement as a "tax-oriented" transaction. In *Sunshine, supra,* involving a transaction remarkably similar to that at issue here, the district court held emphatically that plaintiff had no expectation of profits:

> Looking at the economic realities of the situation before the court, [plaintiff] was not seeking profits as defined by [*Howey*]. [Plaintiff's] inducement for entering into the computer transaction was the hope of favorable federal income tax benefits, ·and by its own complaint the company was interested in a tax shelter. The concern, therefore, was that the transaction show a loss, not a profit, and the success or failure of the venture would depend upon Sunshine's own accounting procedures, not the managerial efforts of [defendant]. If [defendant] somehow failed to lease the computers, an even greater loss would be generated to offset [plaintiff's] other profits. Thus it is not possible to say that [plaintiff] entered the transaction with the expectation of profits to come from [defendant's] efforts.

403 F.Supp. at 722. The same is equally true here.

---

14. The only linkage between the fortunes of the parties involved here concerned the ultimate validity of the anticipated tax benefits and the management of the computer systems to insure that monthly income offset the debt service. In view of the unitary nature of the contract, and the importance of HITK's accounting procedures, as in *Sunshine, see* Part II.A.1.a.ii. *infra,* this linkage is neither so inextricable nor substantial as to satisfy the *Howey* requirement that the economic realities of the transaction include a "common enterprise."

15. As a further indication of how convoluted this area of the law can be, some courts have

applied the tax implications of sales/leaseback plans as part of the commonality element. In *Energy Systems, supra,* the court held that "the joint interest of the investors in obtaining income tax benefits from the lease of the Systems is further evidence of the horizontal commonality of the enterprise organized by defendants." 642 F.Supp. at 736. In contrast, in *Kolibash, supra,* the court held that "the favorable tax advantages each investor sought were tied to the investment and participation of others in the Program," so that vertical commonality was present. 626 F.Supp. at 1177–78.

In *Lindemuth, supra,* the court held that the third *Howey* factor was met, stating succinctly:

> ... plaintiffs have declared that they expected profits because the lease payments were supposed to exceed the debt service. Further, they expected to be able to resell the equipment at the end of the lease term for close to what they paid for it....

660 F.Supp. at 266. *See also Professional Financial, supra,* 692 F.Supp. at 1061 (same). Again, no such profits were anticipated here.

The court in *Kolibash, supra,* specifically rejected the decision reached in *Sunshine, supra,* by holding that anticipated tax benefits, in and of themselves, satisfy *Howey:*

> Why profits must be only in the form of dividends, profit sharing, or capital appreciation for an investment to be considered a security ... appears, at least to this Court, to be beyond the flexible approach developed by the Supreme Court in *Howey.* Moreover, excluding tax benefits from the scope of the meaning of profits, particularly when tax benefits are the primary inducement for an individual to invest in a scheme, flies in the face of the economic reality. More importantly, a definition of "profits" which excludes tax benefits, at least under the circumstances of the present case, would be contrary to the remedial nature of the securities laws and their central purpose of protecting investors.... Therefore, the Court concludes that where, as in the present case, tax benefits are 'the primary or dominant economic inducement for investing, such tax benefits may properly be considered "profits" within the meaning of *Howey.*

626 F.Supp. at 1179. In *Kolibash,* there was clear evidence that all three major *Howey* factors were met—horizontal commonality, profits in the form of tax benefits, and profits which resulted solely from the defendant promoter's entrepreneurial ability.[16] Given such strong facts, ·coupled with a broad reading of the *Howey* test's flexibility, the court thus held that tax benefits could satisfy the *Howey* requirement of an expectation of profits. *Id.* The *Kolibash* court distinguished *Sunshine,* as the tax benefits expected in that case resulted from the plaintiff's accounting practices, rather than the defendant's ability to perpetuate the investment scheme. The facts of present case, involving a lone corporate investor, are analogous to *Sunshine* rather than *Kolibash.* Further, the absence of horizontal commonality argues against a broad reading of the remedial purpose of the federal securities laws and in favor of a reliance upon the economic substance of the transaction. The substance of the transaction alleged by Coan includes no reasonable expectation of profits flowing from defendants' entrepreneurial or managerial efforts. Under both *Sunshine* and *Kolibash,* plaintiff has not alleged facts sufficient to state a claim under the federal securities statutes.

Thus, based upon these decisions, the Court finds HITK and/or HITK Financial had no reasonable expectation of profits from the efforts of defendants or third parties as alleged in the counterclaims.

### b. "REVES" FACTORS

At issue in *Reves, supra,* was whether unsecured demand notes issued by a farmer's cooperative, sold to over 1,600 people through advertisements in the co-op newsletter, constituted "securities." The Supreme Court held that the *Howey* test was not appropriate when reviewing "notes" as opposed to "investment contracts." The *Reves* Court instead adopted the "family resemblance" approach used by the Second

---

**16.** This factor is discussed extensively in *Lindemuth, supra,* the facts of which are discussed on pp. 937–938 *supra.* The court held that "solely" means that the "efforts made by others are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." 660 F.Supp. at 266 (citation omitted). Because it was "possible that plaintiffs' profits depended on Shannon's management skills and skills in finding a buyer and negotiating the terms of the disposition of the equipment," summary judgment for the defendants was denied. *Id. See also Albanese, supra,* 823 F.2d at 410–12; *Professional Financial, supra,* 692 F.Supp. at 1061–62; *Energy Systems, supra,* 642 F.Supp. at 738–39.

Circuit, under which an issuer is "to rebut the presumption that a note is a security if it can show that the note in question 'bear[s] a strong family resemblance' to an item on the judicially created list of exceptions ... or convinces the court to add a new instrument to the list." 494 U.S. at 64, 110 S.Ct. at 950 (citations omitted). The Court in *Reves* adopted this four-part test:

> First, we examine the transaction to assess the motivations that would prompt a reasonable seller and buyer to enter into it. If the seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit the note is expected to generate, the instrument is likely to be a "security." If the note is exchanged to facilitate the purchase and sale of a minor asset or consumer good, to correct for the seller's cash-flow difficulties, or to advance some other commercial or consumer purpose, on the other hand, the note is less sensibly described as a "security." ... Second, we examine the "plan of distribution" of the instrument, ... to determine whether it is an instrument in which there is "common trading for speculation or investment." ... Third, we examine the reasonable expectations of the investing public: The Court will consider instruments to be "securities" on the basis of such public expectations, even where an economic analysis of the circumstances of the particular transaction might suggest that the instruments are not "securities" as used in that transaction.... Finally, we examine whether some factor such as the existence of another regulatory scheme significantly reduces the risk of the instrument, thereby rendering application of the Securities Act unnecessary.

Id. at 66–67, 110 S.Ct. at 951–52 (multiple citations omitted).

Due to the recent issuance of this opinion, it is unclear whether courts ought to apply the more traditional *Howey* factors to sales/leaseback arrangements, or whether the *Reves* elements are more appropriate. Even assuming *arguendo* that *Reves* does apply, it is clear that the securities laws do not apply to the arrangement at issue here. None of the first *Reves* factors apply here—the seller's purpose was *not* to raise money for the general use of a business enterprise or to finance substantial investments, and the buyer was *not* interested primarily in the profit the note was expected to generate. Second, as the transaction took place solely between BAS-LI and HITK Financial, with JMA as an intermediary, there was no grand "plan of distribution" for which there was "common trading for speculation or investment." For this same reason, the third element does not apply, as there was no "investing public" whose "reasonable expectations" must be protected. The fourth factor has no bearing here. Therefore, even under the more recent *Reves* analysis, the sales/leaseback arrangement has no "securities" implications.

### 2. No Sale of a Security

The JMA Defendants and Scheinman also argue that no "sale" of a security was involved here. In light of the conclusion reached in Part II.A.1. *supra*, there is no need to discuss this argument.

### 3. Summary

Accordingly, under both the *Howey* and *Reves* tests, the motions of the JMA Parties, Scheinman, Auslander, and Smith to dismiss Coan's first and second counts are granted.[17]

## B. THIRD AND FOURTH COUNTS

The defendants similarly have raised a variety of arguments with respect to the state law claims, only some of which need to be addressed in this ruling.

---

**17.** Although Hasen did not make this argument, the ruling obviously pertains to him, and BAS- LI, as well.

### 1. Subject Matter Jurisdiction

The JMA Parties, Scheinman, Smith and Hasen argue that once the federal securities claims have been dismissed, the Court lacks subject matter jurisdiction over the remaining state law claims, under the doctrine set forth in *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966), no other basis for jurisdiction having been asserted by Coan. Though not specifically alleged, the complaint itself sets forth a basis for diversity jurisdiction under 28 U.S.C. § 1332. (*Compare* Complaint ¶ 5 *with* ¶¶ 6–16). Since Coan could easily amend his complaint to allege diversity jurisdiction, the Court will address many of the other arguments advanced by defendants.

### 2. In Personam Jurisdiction

The JMA Parties, Smith and Hasen argue that this Court lacks personal jurisdiction over them. The sole allegation with respect to *in personam* jurisdiction by this court is found in ¶ 3 of the complaint, which reads in full: "One or more of the acts charged herein occurred in the District of Connecticut and the Defendants had either transacted business in and are located in this district."

█ In diversity cases, federal courts must look to the forum state's long-arm statute to determine if personal jurisdiction may be obtained over a nonresident defendant. *Savin v. Ranier*, 898 F.2d 304, 306 (2d Cir.1990) (citation omitted). In construing the applicable Connecticut long-arm statutes, federal courts must follow a two-part test:

> The first tier involves the threshold question of whether the federal district court has jurisdiction under the forum state's law. If it does, the second tier involves the question of whether the exercise of personal jurisdiction, allowed by state law, would violate the Due Process Clause[.]

*David v. Weitzman*, 677 F.Supp. 95, 96 (D.Conn.1987). *See also Morris v. 7th and Beech Church of Christ*, Civ. No. H89–738(PCD), 1990 WL 484231 (D.Conn. June 6, 1990), slip op. at 3–4; *Mischel v. Serack Shoes, Inc.*, Civ. No. H90–92 (TEC), 1990 WL 484229 (D.Conn. June 5, 1990), slip op. at 15–16; *Conlin v. Rocking Horse Ranch Corp.*, Civ. No. H89–473 (AHN), 1990 WL 484230 (D.Conn. Apr. 20, 1990), slip op. at 2–3; *Spotlight Marketing Corp. v. BPI Communications, Inc.*, Civ. No. B89–404 (JAC) (D.Conn. Feb. 2, 1990), slip op. at 2; *Altorfer v. Special Metals Corporation*, Civ. No. B88–405(WWE) (D.Conn. March 8, 1989), slip op. at 5; *Edelman v. J.B. Lippincott Co., Inc.*, Civ. No. B88–426 (TFGD) (D.Conn. Feb. 2, 1989), slip op. at 2, 1989 WL 225418; *New England Systems, Inc. v. Service of North America, Inc.*, Civ. No. N87–359 (EBB) (D.Conn. Nov. 13, 1987), slip op. at 3–4; *Teleco Oilfield Services, Inc. v. Skandia Ins. Co.*, 656 F.Supp. 753, 756 (D.Conn.1987).

█ The plaintiff has the burden of establishing, by a preponderance of the evidence, that personal jurisdiction exists. *Savin, supra*, 898 F.2d at 306; *Hoffritz for Cutlery, Inc. v. Amajac, Ltd.*, 763 F.2d 55, 57 (2d Cir.1985); *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981); *Morris, supra*, slip op. at 4; *Mischel, supra*, slip op. at 16; *Conlin, supra*, slip op. at 3; *Swanson v. Edgewood Golf Course of Southwick, Inc.*, Civ. No. H89–470(PCD) (D.Conn. Feb. 20, 1990), slip op. at 2, 1990 WL 484232; *Atlantic Maritime Enterprises Corp. v. Hong Kong Borneo Services, Inc.*, Civ. No. B88–674 (EBB) (D.Conn. Feb. 2, 1990), slip op. at 3, 1990 WL 484929; *David, supra*, 677 F.Supp. at 98; *Crestmont Federal Savings & Loan Association v. Craumer*, Civ. No. B89–503 (TFGD) (D.Conn. Nov. 16, 1989), slip op. at 3; *Whelen Engineering Co., Inc. v. Tomar Electronics, Inc.*, 672 F.Supp. 659, 661 (D.Conn.1987); *Teleco, supra*, 656 F.Supp. at 756. In ruling upon a motion to dismiss for lack of personal jurisdiction, the court may proceed upon written submissions or through an evidentiary hearing; where no evidentiary hearing is held, the plaintiff need only make a prima facie showing, through affidavits and supporting materials, that jurisdiction exists. *Hoffritz, supra*, 763 F.2d at 57; *Morris, supra*, slip op. at 4; *Conlin, supra*, slip op. at 4; *Swanson, supra*, slip op. at 2; *Atlantic Mari-*

*time, supra,* slip op. at 3–4; *NESP Co., Ltd. of Enfield v. Benchmark Industries, Inc.,* Civ. No. H86–1380(MJB) (Feb. 5, 1988), slip op. at 3; *David, supra,* 677 F.Supp. at 98; *New England Systems, supra,* slip op. at 4; *Whelen, supra,* 672 F.Supp. at 662; *Teleco, supra,* 656 F.Supp. at 756. All ambiguities must be resolved in the plaintiff's favor. *Hoffritz, supra,* 763 F.2d at 57; *Marine Midland, supra,* 664 F.2d at 904; *Morris, supra,* slip op. at 4; *Swanson, supra,* slip op. at 2; *Atlantic Maritime, supra,* slip op. at 4; *NESP, supra,* slip op. at 3; *David, supra,* 677 F.Supp. at 98; *Teleco, supra,* 656 F.Supp. at 756. However, in order to make a prima facie showing of jurisdiction, a plaintiff may not rely only on conclusory statements. *NESP, supra,* slip op. at 4.

Coan makes no reference in his complaint to the Connecticut long-arm statute or statutes upon which he relies. His sole reference in his brief is to Conn.Gen.Stat. § 52–59b(a)(2), with no caselaw citations. Because Coan could easily amend his complaint to allege the proper statutory provisions, the court will therefore analyze the statutes which might apply here.

### a. THE CORPORATE DEFENDANTS

The four corporate defendants are JMA, Equitable, Matrix, and GICC, all of which are Delaware corporations. None of them own any property in Connecticut, do business here, or regularly transact business here. (Mallin Aff't ¶ 4; Gangel Aff't ¶ 3).[18] In his affidavit, Mallin avers as follows:

> ... For the purpose of the transaction which is the subject of this suit, the home of one of my former secretaries in East Haddam, Connecticut, was used to receive mail. At no time did JMA have

an office in Connecticut from which any business was conducted.

> The only time I have been in the State of Connecticut to conduct any business in connection with the transaction involved in this case was during July, 1986, when, as an officer of JMA, I was invited by Richard Bertoli and Stanley Scheinman to visit the HITK Corporation in Stamford, Connecticut to discuss possible tax shelter transactions. Except for that one time, neither I nor any employee or agent of JMA has conducted any business in that State in connection with this transaction.

(Mallin Aff't ¶¶ 2–3).

There are three potential statutory bases for personal jurisdiction over the corporate defendants here—Conn.Gen.Stat. §§ 33–411(b), (c)(1) and (c)(4).

#### i. Conn.Gen.Stat. § 33–411(b)

Section 33–411(b) provides in full: "Every foreign corporation which transacts business in this state in violation of section 33–395 or 33–396 shall be subject to suit in this state upon any cause of action arising out of such business."[19] The federal courts consistently have held that § 33–411(b) does not extend to the permissible constitutional limits. *Atlantic Maritime, supra,* slip op. at 4 n. 2; *New England Systems, supra,* slip op. at 13; *Bross Utilities Service Corp. v. Aboubshait,* 489 F.Supp. 1366, 1371 & n. 30 (D.Conn.), *aff'd mem.,* 646 F.2d 559 (2d Cir.1980) ( & multiple citations therein). The cases most factually similar to the instant one are *Bross, supra,* and *Atlantic Maritime, supra. Bross* involved a Connecticut resident who described himself as an agent of the three defendant Saudi Arabian corporations and who held two meetings at plaintiff's Con-

---

**18.** This portion of the motion is really one under Rule 12(b)(2), for lack of personal jurisdiction, as opposed to a Rule 12(b)(6) motion for failure to state a claim. In considering Rule 12(b)(2) motions, a court may consider affidavits and documents submitted by the parties, *see* notes 2 & 4 *supra,* without converting such motions in ones for summary judgment under Rule 56. *NESP, supra,* slip op. at 4. *See also Publications Group, Inc. v. American Society of Heating, Refrigeration & Air Conditioning Engineers, Inc.,* 566 F.Supp. 316, 318 (D.Conn.1983).

*Cf. Festa v. Local 3, Int'l Brotherhood of Electrical Workers,* 905 F.2d 35, 38 (2d Cir.1990), (no conversion necessary for Rule 12(b)(1) motions).

**19.** Sections 33–395 and 33–396 prohibit a foreign corporation from transacting business in this State unless empowered to do so by a general or special act of the state, or unless it has procured a certificate of authority from the Secretary of State, respectively.

necticut headquarters; all other communications between plaintiff and these defendants were by telephone or through international telexes. 489 F.Supp. at 1370. Judge Cabranes held that there was no jurisdiction over these foreign corporations under § 33–411(b), as "[t]he transmission of communications between an out-of-state defendant and a plaintiff within the jurisdiction does not, by itself, constitute the transaction of business in the forum state." *Id.* at 1371–72. Similarly, the plaintiff in *Atlantic Maritime* engaged in negotiations with the defendant Hong Kong corporation by telephone and telex communications, culminating in an oral agreement which was confirmed in a telex. Slip op. at 2–3. Under these circumstances, Chief Judge Burns found that there was no jurisdiction under § 33–411(b). Slip op. at 7–8.

█ It is absolutely clear that Equitable and Matrix did not transact business in Connecticut.[20] The only allegations in the complaint against GICC are that on March 2, 1987 and again on May 19, 1987, GICC sent reminder letters to HITK Financial for payments, which payments were made promptly thereafter. (¶¶ 59–60). JMA's only connection with this state was that Mallin's former secretary received mail for JMA at her East Haddam, Connecticut home,[21] and at the invitation of Messrs. Bertoli and Scheinman, Mallin had a business meeting in July 1986 at HITK's Stamford office in his capacity "as an officer of JMA." (Mallin Aff't ¶¶ 2–3). It is additionally alleged that JMA sent a demand letter to HITK Financial on or about November 18, 1987. (Complaint ¶ 62). Such contacts are even more remote than those at issue in *Bross, supra,* and in *Atlantic Maritime, supra,* which were held to be insufficient. Thus, this court lacks *in personam* jurisdiction over the corporate defendants under Conn.Gen.Stat. § 33–411(b).

ii. Conn.Gen.Stat. § 33–411(c)(1)

█ Conn.Gen.Stat. § 33–411(c)(1) provides in pertinent part:

Every foreign corporation shall be subject to suit in this state, ... whether or not such foreign corporation is transacting or has transacted business in this state and whether or not it is engaged exclusively in interstate or foreign commerce, on any cause of action arising as follows: (1) Out of any contract made in this state or to be performed in this state ...

Coan has not alleged that the late December 1986 closing, consummating this transaction, took place in Connecticut. It is clear that for purposes of § 33–411(c)(1), a contract is considered "made" when and where the last thing is done which is necessary to create an effective agreement. *New England Systems, supra,* slip op. at 6–7 (eight-hour negotiation session held in New Jersey, at conclusion of which letter-agreement was signed, did not result in contract being made in Connecticut); *McFaddin v. National Executive Search, Inc.,* 354 F.Supp. 1166, 1170 n. 8 (D.Conn. 1973) (execution by defendant of contract in the District of Columbia precluded finding that contract was made in this state). *See also Gerber Group, Ltd. v. Proto-Craft Model & Mold Inc.,* Civ. No. B85–117(RCZ) (D.Conn. Sept. 21, 1987), slip op. at 5.

With respect to the second-prong of § 33–411(c)(1), *i.e.,* contracts "to be performed in this state," the district judges have rejected any argument that such language is to "be given a limited construction to require performance in this state by the party over whom jurisdiction is sought." *Clemco Corp., Inc. v. Frantz Mfg. Co.,* 609 F.Supp. 56, 57 (D.Conn.1985); *Bowman v. Grolsche Bierbrouwerij B.V.,* 474 F.Supp. 725, 731–32 (D.Conn.1979). In fact, in *Bowman, supra,* Judge Daly held that

**20.** Exh. E contains copies of three checks drawn on Equitable's checking account, dated January 5, 1987, February 5, 1987, and July 16, 1987, on which the corporate address is in Cos Cob, Connecticut. These checks, by themselves, are insufficient to demonstrate that Equitable was transacting business in this state.

**21.** Coan submitted copies of various federal tax forms which list JMA's address in East Haddam (Exhs. D(a)–(b)) and copies of letters from JMA with this address (Exhs. D(c) & (e)).

where the contract "contemplated and required performance" in the state by plaintiff, defendant was subject to jurisdiction under § 33–411(c)(1).

Here, the only performance alleged in the complaint is HITK Financial's payment to BASLI of $157,034.67 in March 1987 and its payment to GICC of $161,193.01 in June 1987. (Complaint ¶¶ 58–60). As HITK Financial is a Connecticut corporation, the Court must infer that these payments were generated from Connecticut. In *Teleco, supra,* Judge Zampano held that a Connecticut-based corporation's payments of insurance premiums to the defendant Scandinavian insurance companies subjected such companies to jurisdiction in this state for a claim of breach of the insurance contract and for bad faith tortious acts. The court ruled: "... Teleco's payment of premiums from Connecticut constitutes actual and substantial performance of the terms of the contract with the Scandinavian Insurers in this state." 656 F.Supp. at 757. The facts giving rise to that lawsuit involve far more involved relations than those in the present suit. In *Teleco,* defendants had insured certain equipment used on offshore rigs; under the two policies in effect, plaintiff recovered $637,200 under the first policy and claimed an additional forty-eight losses, of $180,000 apiece, during a one-year period under the second policy. *Id.* at 755. In addition to its premium payments, plaintiff was required to submit quarterly reports, and the defendants exercised their right to inspect plaintiff's books in Connecticut. *Id.* at 755–56. This involvement between the parties is more intense than the single payment made by HITK Financial, presumably from Connecticut, to GICC in June 1987.

Moreover, even assuming *arguendo* that the requirements of § 33–411(c)(1) were met, application of that section to the facts here would exceed constitutional limits. As the Connecticut Supreme Court ruled in *Lombard Bros., Inc. v. General Asset Management Co.,* 190 Conn. 245, 255, 460 A.2d 481 (1983), under § 33–411(c), "... it is the totality of the defendant's conduct and connection with this state that must be considered, on a case by case basis, to determine whether the defendant could reasonably have anticipated being haled into court." With respect to subsection (c)(1), that court held that "... even incidental acts of performance of contracts in this state would come within our statute if the defendant had other significant contacts with this state." *Id.* at 256–57, 460 A.2d 481. The defendant's contacts with Connecticut in *Lombard Bros.* were far more extensive than those presented here, where plaintiff had transferred funds from a Connecticut bank to a New York bank, defendant had mailed 145 confirmation statements from New York to here, defendant had placed two notices in the *New York Times* and the *Wall Street Journal,* and defendant had twelve other customers in Connecticut, with whom it had placed $771,000,000 in trades, representing 0.6 percent of its total business. *Id.* at 255–56. "Given the sparsity of contacts presented by the present record," the Connecticut Supreme Court thus concluded that plaintiff had not met its burden of proving that § 33–411(c)(1) conferred jurisdiction over the defendant. *Id.* at 257. *See also Altorfer, supra,* slip op. at 8–9.

iii. Conn.Gen.Stat. § 33–411(c)(4)

Conn.Gen.Stat. § 33–411(c)(4) provides:

Every foreign corporation shall be subject to suit in this state, ... whether or not such foreign corporation is transacting or has transacted business in this state and whether or not it is engaged exclusively in interstate or foreign commerce, on any cause of action arising as follows: ... (4) out of tortious conduct in this state, whether arising out of repeated activity or single acts, and whether arising out of misfeasance or nonfeasance.

Coan's Third and Fourth Counts are for fraud and negligent misrepresentation, respectively, both of which constitute "tortious conduct."

Connecticut district judges have ruled for nearly two decades that false representations entering Connecticut by wire or mail constitute tortious conduct in Connecticut under § 33–411(c)(4). *Mischel,*

*supra,* slip op. at 16–18; *Blumberg Associates, Inc. v. Spectrix Microsystems, Inc.,* Civ. No. H86–1560(TEC) (D.Conn. Feb. 22, 1988), slip op. at 9–10; *David, supra,* 677 F.Supp. at 97; *Teleco, supra,* 656 F.Supp. at 758; *McFaddin, supra,* 354 F.Supp. at 1171. As previously mentioned in Part II.B.2.a.i *supra,* there are absolutely no allegations in Coan's complaint that corporate defendants Equitable and Matrix had *any* communications with anyone in Connecticut. The sole communications had by defendant GICC were the two reminder letters sent to HITK Financial, on March 2, 1987 and May 19, 1987. (Complaint ¶¶ 59–60). There is no allegation, however, that any representations made in such reminder letters were fraudulent.[22]

As to defendant JMA, Mallin, "as an officer of JMA" held a meeting in July 1986 at HITK's corporate headquarters in Stamford with Messrs. Bertoli and Scheinman. (Mallin Aff't ¶ 3). In addition, JMA sent a demand letter to HITK Financial on or about November 18, 1987. (Complaint ¶ 62).[23] The case factually closest to this one is *David, supra,* in which defendants' sole contacts with Connecticut were telephone conversations and correspondence by mail initiated from Florida, in which plaintiff alleged defendants made fraudulent misrepresentations regarding the purchase price of a Florida condominium, the availability of financing, the amount of the deposit, and refund of such deposit. 677 F.Supp. at 95–96. Judge Cabranes held that such allegations presented "a prima facie case of tortious conduct *in* Connecticut sufficient to establish personal jurisdiction under Connecticut's long-arm statute,

[ ]§ 33–411(c)(4) ..." *Id.* at 98 (emphasis in original). He further ruled that due process was not offended, in that the defendants "purposefully availed themselves of the benefits of this state" by their allegedly fraudulent misrepresentations. *Id.* at 99–100. The *David* decision does not quantify the number of telephone conversations and letters initiated by defendants to plaintiff. If communications from afar which enter Connecticut are sufficient to invoke jurisdiction under § 33–411(c)(4), then surely the July 1986 meeting in Stamford, at which JMA was represented by Mallin, similarly is sufficient to satisfy the statutory language and constitutional requirements presented by that long-arm statute.

### b. THE INDIVIDUAL DEFENDANTS

The four individual defendants who claim lack of *in personam* jurisdiction are Smith, Hasen, Mallin, and Gangel, none of whom are Connecticut residents.[24] There are two potential statutory bases for personal jurisdiction over them—Conn.Gen.Stat. §§ 52–59b(a)(1) and (2).

#### i. Conn.Gen.Stat. § 52–59b(a)(1)

Conn.Gen.Stat. § 52–59b(a)(1) provides in relevant part: "... a court may exercise personal jurisdiction over any nonresident individual ... who in person or through an agent ... transacts any business within the state ..." In *Zartolas v. Nisenfeld,* 184 Conn. 471, 474, 440 A.2d 179 (1981), the Connecticut Supreme Court observed that the term "transacts any business" is not defined within the statute; the court accordingly construed that term "to embrace a single purposeful business transaction." The court then elaborated:

---

22. In his brief in opposition, Coan relies almost exclusively upon this Magistrate's prior Recommended Ruling on Defendants' Motions to Dismiss, filed January 24, 1988 and approved on March 1, 1988 (Dkt. # 94) ("Prior Ruling"), in the *BASLI* Action. In that decision, which concerned the fraudulent conveyance claims against defendant Schuck and former defendant V.C.S., Inc., the Court was forced to rely solely upon the allegations in BASLI's complaint, as neither side submitted any affidavits in support of their factual arguments. (Prior Ruling at 4). After discussing the "critical events" test applied in *Bross, supra,* 489 F.Supp. at 1374, the Prior Ruling found that as neither side presented any

affidavits, "there is presently no evidence to dispute that the alleged injury [from the alleged fraudulent conveyances] has its apparent effect in Connecticut where the instant litigation is pending." (Prior Ruling at 6–7, 9). The procedural basis for this recommended ruling clearly differs from that presented in the Prior Ruling.

23. *See also* Exh. D(e) (letter, dated January 12, 1988, from JMA to HITK).

24. In his brief, filed January 8, 1990 (Dkt. # 35), Scheinman specifically stated that he "makes no claim that this Court lacks jurisdiction over his person." (At 2).

In determining whether the plaintiffs' cause of action arose from the defendant's transaction of business within this state we do not resort to a rigid formula. Rather, we balance considerations of public policy, common sense, and the chronology and geography of the relevant factors.

*Id.* at 477, 440 A.2d 179. The court further noted that the phrase "transacts any business" in § 52–59b(a) "has a broader meaning" than the phrase "transacts business" within the various corporate statutes. *Id.* at 476 n. 4, 440 A.2d 179. *See also Crestmont, supra,* slip op. at 6; *Corporate Park Associates v. Goldstein,* Civ. No. H89–173(PCD) (D.Conn. Sept. 7, 1989), slip op. at 3–4; *Joiner v. Greene,* Civ. No. N88–208(EBB), slip op. at 3–4.

In applying this standard, courts have reached varying results. For example, in *Zartolas,* the Connecticut Supreme Court held that the defendants' execution, in Iowa, of a warranty deed for Connecticut realty satisfied the statute, as "execution of a warranty deed pursuant to a sale of real property is a legal act of a most serious nature." 184 Conn. at 475, 440 A.2d 179. Similarly, Judge Dorsey held that the defendant's execution, in New York, of a guaranty of a lease, fell within this long-arm statute, where the office space being leased was in Connecticut, both the lessor and lessee were Connecticut entities, and all notices with respect to the lease were to be given in Connecticut. *Corporate Park, supra,* slip op. at 3–4. The same conclusion was reached in *Joiner, supra,* where the defendant delivered the automobile at issue to plaintiff in Connecticut and accepted partial payment here. Slip op. at 3–4.

Less substantial involvement has led judges to conclude that the statutory requirements of § 52–59b(a)(1) were not met. *See, e.g., Savin, supra,* 898 F.2d at 306–07 (Kentucky defendant's execution of promissory note as part of New York syndication with payments to Connecticut plaintiff insufficient to confer jurisdiction in this state); *Crestmont, supra,* slip op. at 7–8 (foreign defendants' guarantee of limited partnership's obligation to New Jersey plaintiff not within statute, where even though realty was located in this state, payments were to be made in New Jersey); *Greene v. Sha–Na–Na,* 637 F.Supp. 591, 595–96 (D.Conn.1986) (no § 52–59b(a)(1) jurisdiction over partnership for advertisement in *New York Post* for New York performance or for broadcast into Connecticut of national telethon originating in California); *Rosenblit v. Danaher,* 206 Conn. 125, 140–42, 537 A.2d 145 (1988) (no long-arm jurisdiction present over Massachusetts attorneys in legal malpractice suit filed by Connecticut client, where only one meeting was held in Connecticut and litigation at issue had been filed in Massachusetts).

■ It is clear that Hasen, a New York attorney, did not transact any business in Connecticut within the meaning of § 52–59b(a)(1). The sole jurisdictional allegation against Hasen is that he sent a draft tax opinion to HITK Financial in March 1987. (Complaint ¶ 53–54). However, as set forth in *Rosenblit, supra,* that is not enough. The same holds true with respect to Gangel, Smith, and Mallin. Even if the corporations with which Smith and Mallin were affiliated fall within Connecticut's reach, such affiliation does not, in and of itself, impose long-arm jurisdiction here. As Judge Cabranes stated in *Bross, supra,* "Nothing in the record indicates that the individual defendants transacted any business other than through the corporations which they controlled." 489 F.Supp. at 1373. As in *Morris, supra,* slip op. at 7–8, the defendants here have been named "in their various corporate and individual capacity ..." (Complaint ¶ 17). However, the defendants in *Morris* had more contact with Connecticut than did the defendants here, as they actively negotiated the contract with plaintiff on behalf of the defendant Oklahoma church, travelled to Connecticut to meet with plaintiff, solicited funds for the church in Connecticut, and personally signed solicitation letters into this state. *Id.* Even the activities of Mallin, who did hold one meeting in Connecticut and sent one communication here (Mallin Aff't ¶ 3; Complaint ¶ 34), fall short of

those found to establish long-arm jurisdiction in *Morris, supra.*

#### ii. Conn.Gen.Stat. § 52–59b(a)(2)

Conn.Gen.Stat. § 52–59b(a)(2) provides: "... a court may exercise personal jurisdiction over any nonresident individual ... who in person or through an agent ... commits a tortious act within the state ..."[25] In *Joiner, supra,* Chief Judge Burns held that the defendant's telephone solicitations to plaintiff and a personal visit within this state satisfied the jurisdictional requirements of § 52–59b(a)(2). Slip op. at 4. In contrast, in *Raymark Industries, Inc. v. Stemple,* Civ. No. B87–635(WWE) (D.Conn. Oct. 7, 1988), Judge Eginton ruled that the defendant Chicago law firm did not fall within the ambit of this section by having submitted allegedly false claims on behalf of workers injured by exposure to asbestos, which claims were settled in a Kansas district court. Slip op. at 2–3. *See also Greene, supra,* 637 F.Supp. at 596–97. In *David, supra,* Judge Cabranes found that § 52–59b(a)(2) was satisfied by defendants' telephone and mail transmissions from Florida to Connecticut, as such fraudulent misrepresentations into this state are deemed to have occurred within this state. 677 F.Supp. at 97–98.

Plaintiff has not alleged that *any* communications sent by defendant Gangel or Smith into this state were fraudulent. He does, however, allege that in December 1986 defendant Mallin forwarded a computer sheet to Scheinman, presumably in Connecticut, which included prices for computer equipment, which prices exceeded prices listed in a computer guide. (Complaint ¶ 34). However, as Judge Cabranes stated in *Bross, supra,* "Nothing in the record indicates that the individual defendants transacted any business other than

through the corporations which they controlled." 489 F.Supp. at 1373.[26] Again, the only allegation which goes to jurisdictional issues against Hasen is his having mailed a draft tax opinion to HITK Financial in March 1987. Even assuming *arguendo* that this sole written communication satisfies § 52–59b(a)(2), extension of long-arm jurisdiction over him under these circumstances would offend due process considerations. The quantitative and qualitative interaction between Hasen, on the one hand, and HITK and/or HITK Financial, on the other hand, pales in comparison with the interstate communications into Connecticut found to be constitutional in *Joiner, supra,* slip op. at 4, and in *David, supra,* 677 F.Supp. at 99–100.

#### c. SUMMARY

Accordingly, for the reasons stated in Parts II.B.2.a. & b. *supra,* the Court finds that there is personal jurisdiction over defendant JMA pursuant to Conn.Gen.Stat. § 33–411(c)(4) but such jurisdiction is found lacking with respect to Equitable, Matrix, GICC, Smith, Hasen, Mallin, and Gengel.

#### 3. Rule 9(b)

 The JMA Parties, Scheinman, Smith, Hasen, and Auslander further argue that Coan's complaint fails to plead fraud with the particularity required by F.R.Civ. 9(b). Insofar as only four defendants presently remain in this litigation—BASLI, JMA, Scheinman, and Auslander—the Court need only review the Third and Fourth Counts with respect to these parties. The Second Circuit recently summarized the requirements of Rule 9(b) as follows:

> To satisfy the particularity requirement of Rule 9(b), a complaint must ade-

---

**25.** Section 52–59b(a)(3) governs long-arm jurisdiction over a nonresident who "commits a tortious act outside the state causing injury to person or property within the state" if such person "(A) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or (B) expects or should reasonably expect the act to have consequences in the state

and derives substantial revenue from interstate or international commerce ..." Subsections (A) and (B) clearly do not apply here. *See generally V.C. Arguimbau & Co., Inc. v. Spencer Food Co.,* Civ. No. B88–174(TFGD) (D.Conn. Sept. 27, 1988), slip op. at 3–8; *Bross, supra,* 489 F.Supp. at 1374–75.

**26.** The *Morris* decision did not address § 52–59b(a)(2).

quately specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiff contends the statements were fraudulent, state when and where made, and identify those responsible for the statements.

*Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir. 1989) (citation omitted). *See also Quaknine v. MacFarlane*, Dkt. No. 89–7668 (2d Cir. Feb. 26, 1990), slip op. at 1961; *Rocco v. Painewebber, Inc.*, 739 F.Supp. 83, 84–86 (D.Conn.1990); *Stanley Works v. Waxman Industries, Inc.*, Civ.No. H89–594(PCD), 1990 WL 484228 (D.Conn. Mar. 19, 1990), slip op. at 7–10; *In re Prudential Bache/Condron Securities Litigation*, Master Case File Civil No. B88–100(JAC) (D.Conn. Feb. 9, 1990), slip op. at 5–6; *Runes v. Gridcomm, Inc.*, Civ.No. B86–473(TFGD) (D.Conn. Jan. 3, 1990), slip op. at 3–6, 1990 WL 483735. As Judge Dorsey recently observed, where "the transactions are numerous and take place over an extended period of time, less specificity is required." *Schnabel Associates, Inc. v. Connecticut Housing Authority*, Civ. No. H88–541(PCD) (D.Conn. Nov. 15, 1989), slip op. at 3 (citation omitted).

This precise issue previously was discussed in the *BASLI* Action, in this Magistrate's Recommended Ruling on Plaintiff's Motion to Dismiss Counterclaim, filed March 6, 1989 and approved by Judge Nevas on April 17, 1989 (Dkt. # 110) ("March 1989 Ruling"), slip op. at 6–10. That ruling held insufficient HITK's claims as to misrepresentation of the computer equipment at issue in the transaction, while upholding allegations with respect to a failure to disclose material information. (Slip op. at 9–10). Following such ruling, HITK filed its second amended counterclaim, which BASLI also sought to have dismissed. The Magistrate's Recommended Ruling on Plaintiff's Motion to Dismiss Second Amended Counterclaim, filed September 11, 1989 and approved by Judge Nevas on October 4, 1989 (Dkt. # 151) ("September 1989 Ruling"), found that HITK had corrected the insufficiency with respect to affirmative misrepresentations, as a "chain of misrepresentation" had been alleged. (Slip op. at 3–4).

The March 1989 Ruling cautioned, however, that problems could develop when additional defendants were named in HITK's counterclaims. (Slip op. at 26 n. 7). The Second Circuit ruled in *DiVittorio v. Equidyne Extractive Industries, Inc.*, 822 F.2d 1242, 1247 (2d Cir.1987): "Where multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud." The court continued that "derelictions [which] are pleaded against the defendants generally, with little or no specifications as to individual roles" generally are insufficient under Rule 9(b). *Id.* Earlier this year, the Second Circuit dismissed under Rule 9(b) a fraud claim against a corporation where the sole allegation against it was its affiliations with two other defendants; the Court held that this allegation was "insufficient to link" such defendant to the alleged misrepresentation. *Quaknine, supra*, slip op. at 1962–63.

Coan's complaint alleges misrepresentation with respect to the value of the computer equipment which was the subject of the sale/leaseback arrangement (¶ 34), as well as failure to disclose other material information (¶¶ 36–39, 64). The March 1989 Ruling and the September 1989 Ruling held that the counterparts to these paragraphs in the *BASLI* Action were pled with sufficient particularity with respect to BASLI. While these paragraphs may have been too general with regard to the ten defendants other than BASLI (particularly the large group comprising the JMA Parties), the complaint does specify the roles played by the sole remaining defendants, namely BASLI, JMA, Scheinman, and Auslander.

## C. MISCELLANEOUS ARGUMENTS

### 1. Authority/Ratification/Damages

As best as this Court can ascertain, Auslander additionally argues that Coan's complaint ought to be dismissed for failure to state a claim, as it fails to allege that Auslander lacked authority, that any alleged failure to disclose did not apply to him, that his actions were ratified by HITK

Financial, and that the complaint fails to allege damages.[27]

Outside of ¶ 14, which identifies him, the only other allegations against Auslander are as follows: that he received certain materials from Mallin and Hasen (¶¶ 34 & 53); that he received specific instructions from BASLI, Smith, Scheinman, and Hasen (¶¶ 36, 38); that he requested a tax opinion from Hasen (¶¶ 48, 52); that he provided documents to HITK's subsequent counsel (¶ 50); and that he failed to disclose, or did not provide, material information to the Boards of Directors of HITK and of HITK Financial (¶¶ 36, 47, 57).

■ It has long been the law in Connecticut that corporate officers may be "themselves liable [to third parties] for tortious conduct if they knowingly or carelessly assume to bind the corporation without authority, or misrepresent or conceal the true state of their authority, and thus falsely lead others to repose in it." *Jacobs v. Williams*, 85 Conn. 215, 220–21, 82 A. 202 (1912) (citations omitted). Such a claim is made in ¶ 36 of Coan's complaint. Thus, it is not grounds for dismissal that Auslander was acting as a "good soldier" merely in following the instructions of Scheinman and Hasen, with no independent duty to disclose.

■ Auslander cites *Cohen v. Holloways', Inc.*, 158 Conn. 395, 260 A.2d 573 (1969) for the proposition that since HITK Financial had full knowledge of the transaction, it is estopped from denying it. The Connecticut Supreme Court described the doctrine of implicit ratification as follows:

... as a general rule, if the corporation through the officer ... having authority to act, acquires or is charged with knowledge of the unauthorized act, the act not being prohibited by charter or by statute nor contrary to public policy, and does not repudiate it within a reasonable time, but without objection acquiesces therein, it is bound by the unauthorized act....

... [A]s a general rule, if a corporation, with knowledge of the facts, accepts

or retains the benefits of an unauthorized contract or other transaction by its officers or agents, as where it receives and uses or retains money or property paid or delivered by the other party, or accepts the benefit of services, etc., it thereby ratifies the contract or other transaction, or will be estopped to deny ratification. In other words, the law does not permit a corporation to receive and retain the benefits of a contract or transaction and at the same time repudiate liability thereunder or attempt to escape the burdens thereof on the ground that the contract or transaction was not authorized, or that authority therefor was not set forth in its records....

*Id.* at 408–09 (citations omitted). The whole gist of this lawsuit is Coan's claim that the Boards of Directors of both HITK and HITK Financial lacked knowledge of this transaction. The Second Circuit has observed that in ruling on a motion to dismiss for failure to state a claim, the court "is not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir.1985). Auslander's argument on the issue of ratification does not go to the sufficiency of Coan's pleadings. It is an issue more appropriately resolved by either a motion for summary judgment or at trial.

■ Auslander further argues, in one paragraph and without citation, that Coan has failed to allege how his alleged failures to disclose have caused damages. At this pleadings stage, it is only necessary for Coan to allege that HITK Financial *was* damaged. (*See, e.g.,* Complaint ¶¶ 74–75, 84, 90). *Cf. McDonald v. Johnson & Johnson*, 537 F.Supp. 1282, 1362 (D.Minn.1982), *aff'd in part & vacated in part*, 722 F.2d 1370 (8th Cir.), *modified*, 722 F.2d 1390 (8th Cir.), *cert. denied*, 469 U.S. 870, 105 S.Ct. 219, 83 L.Ed.2d 149 (1984) ("It is not necessary that a plaintiff describe his damages with a great degree of certainty. Cer-

---

**27.** Outside of two citations with respect to the standards to be applied to motions to dismiss, Auslander's brief cites only one other case, which is one citation more than is found in Coan's discussion of these issues.

tainty plays a much more important role [at trial] in the measure of proof necessary to establish the plaintiff had in fact sustained some damage.").[28]

Thus, there is no merit to any of these residual claims made by Auslander.

### 2. Rule 4(j)

Defendant Smith additionally argues that service was not made upon him within the 120–day limit set in F.R.Civ.P. 4(b). *See* note 5 *supra.* In light of the conclusions reached in Parts II.A. and B.1.b. *supra,* the Court need not address this issue here.

### D. MOTIONS FOR MORE PARTICULAR STATEMENT

Motions for more particular statement, pursuant to F.R.Civ.P. 12(e), were filed by both Smith and Scheinman. Notwithstanding the extension granted to Coan, *see* note 6 *supra,* for the same reasons as stated in Part II.C.2. *supra,* Smith's motion is denied *without prejudice* as moot.

In his brief in opposition to Scheinman's motion (Dkt. # 45), Coan incorporates by reference HITK's motion for extension of time filed in the *BASLI* Action, which is docket entry number 202. As such motion was granted absent objection, Coan's request similarly is granted.

### III. CONCLUSION

The motions to dismiss filed by the JMA Parties, Scheinman, Auslander, Smith, and Hasen are granted in part and denied in part as follows: For the reasons stated in Part II.A. *supra,* the motions of the JMA Parties, Scheinman, Auslander and Smith are granted with respect to the First and Second Counts, as no "security" is involved. With respect to the Third and Fourth Counts, for the reasons stated in Part II.B.2. *supra,* the motions to dismiss

for lack of *in personam* jurisdiction are granted with respect to defendants Equitable, Matrix, GICC, Smith, Hasen, Mallin and Gangel, but denied with respect to defendant JMA. As to the remaining defendants on these two counts, for the reasons stated in Parts II.B.3. and C. *supra,* the motions to dismiss of defendants Scheinman and Auslander are denied. For the reasons stated in Part II.C.1. *supra,* Auslander's motion for a bond is denied without prejudice to renewal at a later time.

Lastly, the Rule 12(e) motion of defendant Smith is denied without prejudice as moot, and plaintiff Coan may respond to defendant Scheinman's similar motion within twenty-one days of receipt of this recommended ruling.

*See* 28 U.S.C. § 636(b) (written objections to ruling must be filed within ten days after service of same); F.R.Civ.P. 6(a), 6(e) & 72; Rule 2 of the Local Rules for United States Magistrates, United States District Court for the District of Connecticut; *Small v. Secretary, H & HS,* 892 F.2d 15, 16 (2d Cir.1989) (failure to file timely objection to Magistrate's recommended ruling may preclude further appeal to Second Circuit).

Dated at New Haven, Connecticut, this 26th day of June, 1990.

---

**28.** Auslander also requests a bond pursuant to Conn.Gen.Stat. § 33–320(c). As § 33–320 was repealed in 1969, the Court presumes that Auslander is seeking indemnification pursuant to § 33–320a(c). Such motion is denied *without prejudice* as premature, as Auslander has not been "finally adjudged not to have breached his duty to the corporation." To the extent Auslander seeks an application for indemnification under § 33–320a(e), such application is held in abeyance, until there has been more discovery taken in this action.